**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
DISTRICT OF CHARLESTON**

| | | |
|---|---|---|
| SOUTH CAROLINA COASTAL CONSERVATION LEAGUE, SOUTH CAROLINA NATIVE PLANT SOCIETY, AMIGOS BRAVOS, NATURAL RESOURCES DEFENSE COUNCIL, SAVANNAH RIVERKEEPER, and WATERKEEPER ALLIANCE, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 2:20-cv-03062-DCN |
| ANDREW R. WHEELER, in his official capacity as Administrator of the United States Environmental Protection Agency, and the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

1.    A seven-justice majority of the Supreme Court has held that when a state grants a water quality certification to a project under section 401 of the Clean Water Act, it can protect against harms from the project as a whole, not just from a specific discharge. *PUD No. 1 of Jefferson Cty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 711–14 (1994). The new federal regulation challenged here expressly and unlawfully rejects that controlling ruling of the Supreme Court and embraces the reasoning of a two-justice *dissent* on the scope of 401 certifications. *See* Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. 42,210 (July 13, 2020) (to be codified at 40 C.F.R. Part 121) ("401 Rule" or "Rule").

2.    In so doing, it also runs afoul of the plain text of the Clean Water Act.

3.      Because this Rule contradicts plain statutory text and Supreme Court precedent, and unlawfully cripples the ability of states and their residents to protect local waters, natural resources, and communities, it must be vacated.

4.      Since the Clean Water Act's enactment and through federal administrations of both political parties, communities and conservation groups have depended on and participated in section 401 certifications to ensure that federally licensed projects do not impair the waters on which people depend. Implementing Clean Water Act section 401, states and Indian tribes have engaged the public in their deliberations as required under the Act and responded to concerns expressed by local residents and communities by placing conditions in federal permits and licenses to protect clean water and state and local resources.

5.      The process has worked as Congress intended. In response to public comments and concerns, states have for example required that federal dams preserve stream flow necessary for aquatic life and provide fish passage for spawning; that pipeline projects control runoff and other water pollution; and that marsh and wetland destruction be avoided, minimized, and mitigated. And when states have fallen short of their section 401 obligations, the public has held them accountable.

6.      Over the past 49 years—and as required by the Clean Water Act—South Carolina and other states have developed procedures for carrying out their section 401 authority and including the public in decisionmaking. For instance, South Carolina's section 401 regulations require the state to consider all water quality impacts of a project, both direct and indirect, and the cumulative impact of the proposed activity. *See* S.C. Code Ann. Regs. 61-101. South Carolina must deny certification if the proposed activity "adversely impacts" important habitats and rare species. *Id.* Certifications by South Carolina under section 401 routinely include

conditions such as sediment and erosion controls; prohibitions against incidental pollution apart from the permitted discharge; and protections of species, habitat, and archaeological materials.

7.     When, for example, South Carolina agencies resolved the Savannah Harbor litigation filed in this Court, the federal permit included section 401 conditions local conservation groups advocated for to protect fish, preserve thousands of acres of riverside habitat and wetlands, and mitigate harm to upstream freshwater tidal wetlands from the harbor's deepening. Similarly, in upstate South Carolina, when developers sought a permit to eliminate wetlands and populations of a rare state-protected plant, local conservationists submitted comments, and South Carolina thereafter insisted upon protective state law conditions, which ultimately protected the wetlands and the rare plant.

8.     Another state, New Mexico—one of the few states for which EPA issues discharge permits—relies solely on its section 401 certification authority to ensure that federal permits comply with state law. That authority has been crucial for New Mexico to ensure compliance not only with the state's water quality standards but also with state law on water rights and on cultural and religious values of water. New Mexico has also used section 401 to protect drinking water against industrial discharges from facilities like the Los Alamos National Laboratory into the ephemeral tributaries of the Rio Grande and other key New Mexico rivers.

9.     Yet now, to protect a few favored projects from the supposed delay and inconvenience of complying with state law, the current administration has upended a half-century of rule and practice and stripped state authority over thousands of projects each year, hobbling the public's ability to voice concerns and achieve important protections.

10.     Although seven justices of the Supreme Court held that that the plain text of Clean Water Act section 401(d) allows states to consider the harms from a permitted or licensed

activity as a whole, the 401 Rule for the first time limits the states to considering harms from, and imposing conditions related to, only the specific "point source" discharges into "waters of the United States"—expressly adopting the reasoning of the two-justice dissent.

11.     The new Rule also limits the public's ability to participate in the federal permitting and licensing process. First, by limiting what states can do, the new Rule restricts the protections that people can seek from the states when a federal permit or license is under review. Second, the Rule imposes strict timetables on state review and starts the clock when the applicant first requests certification, even if the applicant provides only limited information about the proposed project or activity. The public thus has less time and inadequate information to comment on and request protective conditions for the proposed project, and the state has less time and information to make a lawful, fully-informed decision.

12.     Also, for the first time, the new Rule gives federal agencies the ability to reject state law conditions and to approve federal permits and licenses over state objection. *See* 401 Rule, 85 Fed. Reg. at 42,267–68. Not only has this transfer of power never existed before, it is also contrary to the Clean Water Act's express terms. *See* 33 U.S.C. § 1341(d) (stating that state 401 conditions "shall" be made a condition of the federal permit or license).

13.     Finally, the Rule's reduced scope of state and public review is all the more drastic because of the administration's recent redefinition of "waters of the United States." *See* The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (April 21, 2020) ("Replacement Rule"). In the Replacement Rule, EPA and the Army Corps of Engineers ("Corps") unlawfully excluded countless wetlands and streams from federal Clean Water Act protections—including from vital ephemeral tributaries prevalent in arid states like New Mexico. A challenge to that Rule, brought by some of the plaintiffs here and others, is

pending before this Court. *S.C. Coastal Conservation League v. Wheeler*, No. 2:20-cv-01687-DCN (filed Apr. 29, 2020).

14.     Now, under the 401 Rule, EPA limits states to considering harms from (only point source) discharges to a "water of the United States" in making their decision or imposing conditions, 85 Fed. Reg. 42,285 (to be codified at 40 C.F.R. §§ 121.1(n), 121.3). That limit is unlawful under section 401 and the Supreme Court's decisions, and it is all the more harmful because the Replacement Rule has unlawfully narrowed the select set of waters that may receive protection under the new 401 Rule.

15.     These limitations strikingly underscore the contradiction in the supposed rationales for the two rules. In the Replacement Rule, the administration claimed that it limited the definition of "waters of the United States" to protect the states' "traditional sovereignty . . . over their own land and water resources." 85 Fed. Reg. at 22,252. But in issuing the 401 Rule, EPA insisted that the Clean Water Act "places important limitations on how the . . . [states'] role may be implemented . . . ." *Id.* at 42,211. Even though Congress enacted section 401 to preserve and enhance state authority over water resources within the state, EPA has curtailed that longstanding authority. *Id.* The unifying theme of the two rulemakings is not a concern for state sovereignty—it is the unlawful removal of both federal and state safeguards against water pollution.

16.     The plain text of section 401, the Supreme Court's holdings in two cases, and congressional intent foreclose EPA's arrogation of power from the states to federal agencies under the 401 Rule.

17.     The Rule illegally restricts the ability of the Plaintiffs ("Conservation Groups") and their members to participate in certifications and secure important protections for the waters

they use and their environments and communities. The new Rule exposes to destruction the waters and natural resources these organizations and their members depend on for their health and wellbeing, all in violation of the Clean Water Act.

18.     For these reasons, the Conservation Groups request that the Court vacate and set aside this unlawful Rule. *See* 5 U.S.C. § 706(2).

## JURISDICTION AND VENUE

19.     This action is brought under the Administrative Procedure Act, 5 U.S.C. §§ 701–06, which waives EPA's sovereign immunity, *New York v. U.S. Dep't of Def.*, 913 F.3d 423, 430 (4th Cir. 2019). This Court has jurisdiction over the Conservation Groups' claims under 28 U.S.C. § 1331 (federal question), and may issue a declaratory judgment and further relief pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201, 2202.

20.     Venue is proper in this District and Division under 28 U.S.C. § 1391(e)(1)(C) and Local Civ. Rule 3.01(A)(2) (D.S.C.) because no real property is involved in the action and the South Carolina Coastal Conservation League, a plaintiff in this action, resides within the District and the Charleston Division and does business in the Charleston Division related to the events alleged herein.

## PLAINTIFFS

21.     The plaintiff Conservation Groups include local, regional, and national non-profit conservation organizations with offices and members across the country. They, along with their members, are committed to protecting "the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

22.     South Carolina Coastal Conservation League (the "League") is a non-profit organization incorporated under the laws of South Carolina. Its mission is to protect the natural

environment of South Carolina's coastal plain, including its wetlands and aquatic habitat, and to enhance quality of life in the state's communities. The League joined comments opposing EPA's 401 Rule.

23.     To achieve its mission, the League monitors and publicly comments on development projects across the South Carolina coast, many of which require Clean Water Act section 404 permits from the Corps for dredging and filling wetlands and other waterways, and therefore section 401 water quality certifications from South Carolina.

24.     For example, the League intends to engage in the 401 certification process for a large planned development in Jasper County that will destroy substantial wetland areas. In particular, the League is concerned about stormwater runoff pollution and harm to wetland habitat from new roads breaking up wetland areas.

25.     The 401 Rule will limit the information South Carolina can require from project applicants before the clock starts on the state's certification decision, narrow the types of harm that South Carolina can consider and conditions it can impose, and let some projects escape 401 review entirely. These restrictions will undercut the League's protection of coastal water quality, obstruct its monitoring of harmful projects and participation in the certification process, and deprive the League of information it relies on to educate its members and pursue its mission of protecting South Carolina's coastal plain.

26.     For example, the League will participate in the upcoming 401 certification process for the 278 Corridor project to expand a bridge connecting Hilton Head Island with the mainland. The League is currently participating in the environmental impact statement process for the project, which will require a 404 permit and therefore a 401 certification. The certification process is not yet underway.

27.    The League is concerned about the project's impacts on wetlands, wildlife, and the local community, including from construction and polluted runoff. It intends to seek conditions to prevent or mitigate that harm.

28.    However, the new Rule will limit the information the League has to evaluate and comment on the certification and the types of harms the state can consider in its decision on a 278 Corridor certification. The League is concerned that, under the new Rule, it will have less time and information to advocate for protections from the project than it would under current state and federal law, and that South Carolina's review will be less thorough and less protective. Because the new Rule limits the scope of the state's review and the types of protections South Carolina can impose through certification conditions, many of the protections the League would normally seek will be unavailable. The League is concerned that it will be unable to obtain adequate habitat protections, mitigation for wetlands, and runoff protections under the new Rule.

29.    Though the League will spend additional effort advocating for protections under other processes, other state programs and federal programs, such as the environmental impact statement and 404 permitting processes, will not provide the same breadth of enforceable protections as the certification process would for this project.

30.    The 401 Rule will also harm the aesthetic, recreational, and financial interests of the League's members. The League has more than 3,000 active members, many of whom regularly visit the state's rivers, streams, and wetlands, for birding, wildlife observation, fishing, paddling, hiking, photography, and enjoying nature. Members depend on the League to learn about projects that threaten the waters they treasure and to advocate through fully-informed public comments and other means to protect those waters on their behalf. Members of the League also submit comments to the state on 401 certification decisions, based on information

shared by the League, and they intend to do so in the future. They depend on South Carolina's ability to require project applicants to timely submit full information on project impacts before having to decide whether to grant or deny certification, on South Carolina's consideration of their comments, and on South Carolina's authority to respond to those comments by protecting against a broad range of threats to local waters, resources, and communities. The 401 Rule deprives them of information about projects seeking 401 certification, time to evaluate projects and participate with full and accurate information, and the protections of a lawful 401 process.

31.    At least one League member lives on Hilton Head, and her family home is near where the proposed 278 Corridor project would be built. She observes and walks near the wetlands and wildlife surrounding her family's home, which the project would degrade and destroy. The Rule's restriction of information submission requirements, the time for public participation and decision based on full information, and the scope of conditions deprive her and the League of the opportunity to seek protection for the waters and wetlands she enjoys. The Rule limits South Carolina's power to prevent degradation and seek mitigation conditions, reducing her and her family's enjoyment of the wetlands and wildlife surrounding her home.

32.    The South Carolina Native Plant Society (the "Society") is dedicated to promoting the awareness and knowledge of native plant species and their importance in the South Carolina landscape and history. The Society depends on conditions South Carolina has imposed in 401 certifications to protect rare and wetland plants and their habitats. The importance of these conditions spurred the Society to join comments opposing EPA's proposed 401 rule.

33.    For example, the Society submitted comments opposing a Clean Water Act section 404 permit and section 401 certification for a shopping center in Greenville County,

South Carolina, that would have destroyed a wetland containing the largest remaining population of an extremely rare plant, the bunched arrowhead (*sagittaria fasciculata*), in the Reedy River watershed. This plant exists only in Greenville County and in adjacent areas of North Carolina. In response, South Carolina conditioned its section 401 certification of the federal permit on protections of the plant and coordination with local conservation groups on protecting plants rescued from the site. When the developer failed to abide by those conditions, the Society issued notice that it would enforce them. In response, the developer ultimately abandoned the permit containing the conditions, and the plant population and the wetland were saved.

34.    Section 401 conditions have protected other rare plant populations in South Carolina. The Society has, for example, worked with the owner of one protected area required by a section 401 condition to manage protected habitat.

35.    Given the Rule's new restrictions on scope, information, and timing for state certification decisions, the Society will lose out on information necessary to evaluate future development projects, inform its members, and advocate for plant protections to protect its members' interests. The types of conditions it has successfully secured in the past may be deemed impermissible under the new Rule, impairing the Society's work and ability to achieve its mission.

36.    The new Rule will weaken protections for and destroy habitat for rare plants like the bunched arrowhead, harming Society members who enjoy studying and viewing those plants. Members of the Society participate in plant rescues, habitat restoration for the bunched arrowhead and other rare and native plants, botanical surveys, seed collection, field trips, and lectures. They also enjoy the fellowship of people who share a common passion for native plants. The Society and its members also advocate for protection of South Carolina's native plants, their

habitats, and the state's natural resources. The limitations of the new Rule will constrain their ability to learn about, comment upon, and protect against threats to plants from projects requiring federal permits, like developments requiring 404 permits.

37.    For example, a new construction project is being planned for the habitat area of the bunched arrowhead that will require federal permitting and a 401 certification. The 401 Rule will deprive the Society and its members of their full ability to give informed comment upon that project and seek conditions to protect these rare plants.

38.    Amigos Bravos is a state-wide non-profit water conservation organization formed in 1988. Based in Taos, New Mexico, Amigos Bravos has approximately 2,000 members. Guided by social justice principles, Amigos Bravos is dedicated to preserving and restoring the ecological and cultural integrity of New Mexico's waters and the communities that depend on them. Its mission "is to return New Mexico's rivers and the Rio Grande watershed to drinkable quality wherever possible, and to contact quality everywhere else; to see that natural flows are maintained and where those flows have been disrupted by human intervention, to see that they are regulated to protect and reclaim the river ecosystem by approximating natural flows, while maintaining environmentally sound, sustainable practices of indigenous cultures." Arts. of Incorporation of Amigos Bravos, Inc., art. III.A.

39.    Members of Amigos Bravos live and work throughout New Mexico. They use and enjoy the water resources of New Mexico for drinking, irrigation, livestock watering, fishing, river rafting, kayaking and canoeing, swimming, other recreation, spiritual pursuits, and aesthetic interests. Many of Amigos Bravos' members are active people who frequently hike, fish, raft, and otherwise enjoy the many beautiful rivers, streams and water bodies found in the state. Additionally, some members of Amigos Bravos operate businesses that depend on New

Mexico's waters, including river rafting outfitters and fly-fishing guides. Amigos Bravos engages with its membership in numerous educational programs, including volunteer water quality monitoring, fishing demonstrations, and raft trips.

40.     To further its mission and protect the interests of its members, Amigos Bravos engages in legal and regulatory proceedings before federal and state government agencies that affect water and water quality in New Mexico. For example, on October 21, 2019, Amigos Bravos submitted comments to EPA on its proposed 401 rule. Amigos Bravos also submitted comments on New Mexico's state regulations implementing the state's water quality certification authority under Clean Water Act section 401.

41.     In New Mexico, EPA issues permits under the Clean Water Act for point source discharges of pollutants into "waters of the United States." These federal permits require a 401 certification from New Mexico. Amigos Bravos closely tracks proposed projects and permits, and regularly comments on the certification of federal permits under section 401 and EPA's issuance of permits to discharging facilities in New Mexico like the Los Alamos National Laboratory.

42.     Some Amigos Bravos members live in Santa Fe, New Mexico, and obtain their drinking water, in part, from the Buckman Direct Diversion Project on the Rio Grande, located immediately downstream from Los Alamos National Laboratory. The Laboratory has several federal discharge permits that allow it to discharge pollutants from over 400 separate outfalls into canyon streams on the Pajarito Plateau.

43.     As the sacred homeland of Pueblo Peoples, it is vitally important that clean water be protected on the Pajarito Plateau, where the Laboratory is located and discharges. To that end, Amigos Bravos has actively participated in several permit proceedings and commented on

several section 401 certifications for Laboratory discharges. The facility's discharge permit is up for renewal and out for public comment. Amigos Bravos plans to submit comments on the permit renewal and its associated 401 certification.

44.    Additionally, the streams the Laboratory discharges into, many of which are ephemeral, flow into the Rio Grande immediately upstream of the Buckman Diversion. The 401 Rule strips New Mexico of its authority to impose 401 certification conditions on federally permitted projects like the Laboratory to protect against harms to waters that are not "waters of the United States." Because ephemeral canyon streams are no longer considered "waters of the United States," New Mexico will no longer be able to use 401 certifications to protect those canyon streams and their surroundings.

45.    The 401 Rule therefore deprives Amigos Bravos and its members of the opportunity to advocate for those tributaries' protections through the 401 certification process for the Los Alamos federal discharge permit. As a result, Amigos Bravos' Santa Fe members who obtain their water from the municipal water system are likely to suffer from degraded drinking water or higher utility bills, or both.

46.    Under the 401 Rule, Amigos Bravos and its members will suffer substantial harm. The Rule strips New Mexico of its ability to protect with 401 conditions—and Amigos Bravos, its members, and the public of their ability to pursue protections for—the ephemeral streams that make up the vast majority of New Mexico's waters.

47.    Because the Rule restricts New Mexico's 401 authority, and restricts the information required to trigger the state's obligation to decide on certifications, the Rule prevents Amigos Bravos and its members from receiving full information—and effectively advocating for protective conditions—on large infrastructure projects or permit renewals that harm critical

waters and wetlands, like it has in the past and plans to do in the future for permits issued to industrial facilities and other projects like the Los Alamos National Laboratory. Water quality will be degraded in these waters and in downstream rivers throughout New Mexico—waters that Amigos Bravos works to protect and its members rely on.

48.    Natural Resources Defense Council ("NRDC") is a national environmental advocacy group organized as a New York non-profit membership corporation. NRDC has hundreds of thousands of members nationwide, over 2,600 of whom live in South Carolina. NRDC's mission is to safeguard the Earth, its people, its plants and animals, and the natural systems on which all life depends. NRDC submitted comments opposing the 401 Rule.

49.    NRDC staff members work to secure Clean Water Act protections for rivers, lakes, streams and wetlands, including through public participation and litigation on 401 certification decisions. NRDC has advocated for conditions in 401 certifications or denials of certifications based on factors that may be beyond the new Rule's unlawfully narrow "scope of certification" or "water quality requirements" limitations, and NRDC is concerned project proponents for projects of concern to it and its members may request certification under the new Rule. The Rule would limit the types of protections NRDC could seek from states and the factors NRDC could urge states to consider, increasing the risk of degraded waters. The Rule also deprives NRDC and its members of timely and complete information about projects seeking certification—information they depend on to evaluate and provide input on certification decisions under state law.

50.    The 401 Rule reduces the information available to NRDC members on projects that would harm the waters they depend on for drinking, recreation, and enjoyment. By reducing the projects to which 401 certification obligation applies and the permissible scope of

certification, the Rule reduces the protections NRDC members can support in comments and secure in state decisions.

51.     Savannah Riverkeeper is a non-profit public interest organization headquartered in Augusta, Georgia, and operating in the Savannah River Basin in South Carolina and Georgia. The Savannah Riverkeeper serves as the primary guardian of the Savannah River and strives to respect, protect, and improve the entire river basin through education, advocacy, and action. The Savannah Riverkeeper works to restore water quality in the Savannah River and its lakes and tributaries to fully support fishing, swimming, drinking, recreation and habitat protection; to protect the Savannah River and its lakes and tributaries through the establishment of buffers and the use of best management practices for activities that affect water quality; and to educate the people of the Savannah River Basin by creating a culture of water quality protection, inspiring pride in water resources, and developing ways to protect those resources. Savannah Riverkeeper is a licensed member organization of Plaintiff Waterkeeper Alliance. Savannah Riverkeeper joined comments opposing the proposed 401 Rule.

52.     The Savannah Riverkeeper, along with the League, actively opposed deepening of the Savannah Harbor, submitted extensive comments on that project during the state 401 certification process, and brought litigation to contest that project, which ultimately resulted in the state 401 conditions described in paragraph 7 above. Several of those conditions would not have been allowed had the 401 Rule been in effect.

53.     The Savannah Riverkeeper and its members intend to participate in and comment during state 401 certification processes for other projects in both South Carolina and Georgia in the future, including upcoming dam relicensings and port expansions that will be subject to the new Rule. They are already engaged in a stakeholder process for the 2025 relicensing for Stevens

Creek dam just upstream of Augusta, which will require a 401 certification. To advance its mission and the interests of its members, Savannah Riverkeeper will submit public comments for the 401 certification seeking protections for fish passage, stream flow, habitat, and rare aquatic plants. However, Savannah Riverkeeper is concerned these protections will be considered outside the scope of the new Rule.

54.    Savannah Riverkeeper members depend on the full suite of protections Congress guaranteed through section 401 to ensure the River and the river basin remain healthy, thriving areas to birdwatch, hike, and paddle. For example, one longtime member lives in Augusta and loves paddling his kayak among the islands between the Stevens Creek Dam and the Canal Diversion Dam. He depends on clear waters not only to see and enjoy fish and other creatures while kayaking, but to safely spot and avoid rocks and logs that could damage his kayak. Sufficiently high flows also make his paddling safer and more enjoyable. With the help and information provided by the Riverkeeper, he has spoken up for robust 401 protections in the past, and intends to do so for the Stevens Creek Dam relicensing certification. Under the new 401 Rule, the minimum flow and turbidity protections that 401 conditions currently provide could be deemed beyond the scope of certification, making the River a less enjoyable and safe place to paddle.

55.    Waterkeeper Alliance connects and supports local Waterkeeper member organizations and affiliates, including several in South Carolina, to champion clean water issues around the country and the world. Waterkeeper Alliance seeks to protect fishable, swimmable, and drinkable waterways worldwide through education and investigation, regulatory and legislative advocacy, and litigation. Waterkeeper Alliance submitted comments on behalf of itself and 78 U.S. member organizations and affiliates opposing the proposed 401 Rule.

Waterkeeper Alliance and its member organizations and affiliates routinely submit public comments to states on section 401 certifications across the country, advocating for states to use the full extent of their authority under section 401 to ensure projects comply with state law. Waterkeeper Alliance also relies on information project applicants submit to states in section 401 applications, both to participate in certification decisions and to inform its members and pursue its mission through legislation, litigation, and other efforts.

56.     Waterkeeper Alliance and its member organizations have previously advocated for and secured water quality protections in 401 certifications that would likely be impermissible under EPA's new Rule, such as mitigation for turbidity and endangered species protections from construction of the new Tappan Zee Bridge over the Hudson River. Waterkeeper Alliance and its member organizations are currently engaged in projects in California, Maryland, New York, North Carolina, Oregon, and other states that require federal licenses or permits and could be subject to the new Rule. The new Rule would deprive Waterkeeper Alliance and its members of the water quality protections section 401 should guarantee, and of the opportunity to meaningfully participate, with full information and time, in decisions regarding these projects.

57.     Waterkeeper Alliance has two classes of members: member organizations (local Waterkeepers, Riverkeepers, Baykeepers, Soundkeepers, etc.), such as Plaintiff Savannah Riverkeeper, and individual supporting members. Waterkeeper Alliance advocates and litigates when necessary on matters of national importance on behalf of itself, its member organizations, and their collective respective individual members. For example, Waterkeeper Alliance intervenes in proceedings before the Federal Energy Regulatory Commission in natural gas pipeline and hydroelectric dam proceedings to protect the environmental and health interests of numerous Waterkeeper member organizations, and their respective members, who may be

adversely affected by these projects. All of these projects require section 401 certifications from affected states.

58.     To protect the waters and resources their members use and value, the Conservation Groups push states to thoroughly review projects requiring 401 certifications and exercise the full extent of the authority Congress provided. By constraining what projects section 401 applies to, the scope of permissible conditions, and the timing of review, and by allowing federal agencies to veto state decisions, the 401 Rule impairs the Conservation Groups' ability to function and achieve their missions. It also harms their members' access to information, rights to participate in decisionmaking, and use and enjoyment of rivers and other waters throughout the country.

59.     First, the Rule reduces the information project applicants must provide to start the clock for states to grant or deny certifications. 85 Fed. Reg. 42,285 (to be codified at 40 C.F.R. § 121.5). Even if project applicants submit incomplete or inaccurate project information, and that information is not sufficient for a meaningful 401 certification review, the time for the state to make its certification decision, as well as for public notice and comment, is triggered by that incomplete submission. Project applicants might not provide additional information states request until later, or might not provide it at all.

60.     This reduced information requirement deprives the Conservation Groups and their members of information essential to protecting the waters they care about. In particular, it deprives the Conservation Groups and their members of information they have a right to under state laws.

61.     The Conservation Groups will therefore have less time to evaluate information submitted and use it in comments and other aspects of their work—or, they will never see the

relevant and necessary information at all. The Conservation Groups will have to submit comments and participate in public hearings based on incomplete project information. The Conservation Groups will also not be able to fulfill their missions of educating their members because they will lack information about projects seeking certification.

62.     To the extent possible, the Conservation Groups will devote research and technical expertise to developing information about projects the applicant should rightfully have provided and presenting that information to states. Often, substituting for information from the applicant will be impossible.

63.     The Conservation Group members will similarly lose out on information about dams, highways, pipelines, or developments that affect the waters they swim in, fish in, boat in, or drink from. That deprivation of information and time will impair their ability to advocate for stronger conditions and protections under section 401. It will also impair their ability to make informed decisions about whether, when, and how to use rivers, lakes, and streams in their communities.

64.     Second, because the Rule starts the clock before an application must be complete and requires federal agencies to set a "reasonable time" for decision, the Rule will cut short public comment and public hearing requirements state laws currently provide. This will deprive the Conservation Groups and their members of the right to fully participate in state 401 processes.

65.     Third, because the Rule illegally constrains what harms states can consider and conditions they can impose on projects, the Conservation Groups' and their members' input may be considered out of the scope of certification and unlawfully ignored. The Rule deprives the Conservation Groups and their members of the opportunity to raise concerns and seek conditions

necessary to protecting rivers, streams, wildlife, and other resources—opportunities that the Clean Water Act and longstanding state regulations have provided.

66.    The Rule's unlawful creation of a federal veto over state decisions further harms the Conservation Groups and their members. Rather than being able to rely on the finality of protections they have secured through state decisions and state judicial review, the Conservation Groups will have to challenge federal agency vetoes that the Clean Water Act prohibits.

67.    Beyond depriving the Conservation Groups and their members of information and the time and opportunity to participate in decisionmaking, the Rule will harm them by increasing dredging, pollution, and destruction of the waters they care about. Ultimately, the Rule will allow more projects to escape the scope of 401 review the Clean Water Act requires: certifications will be granted without conditions that would ensure compliance with law; certifications will be granted that should have been denied; or certifications will be avoided entirely.

68.    These lost protections frustrate the Conservation Groups' ability to secure clean and healthy water for their members, for plants and wildlife, and for local communities.

69.    The Rule's unlawful limits on state authority will harm rivers, lakes, streams, wetlands, wildlife, habitat, the environment, and local communities, and reduce the use and enjoyment of Conservation Group members in paddling, preserving native plants, operating their businesses and other activities.

## DEFENDANTS

70.    Defendant United States Environmental Protection Agency issued the 401 Rule. The White House's Executive Order charged EPA with undertaking this rulemaking to restrict states' 401 authority; all other federal agencies' 401 regulations must conform to EPA's Rule.

71.    EPA was established with the "mission" of "protect[ing] human health and the

environment." EPA, Our Mission and What We Do, https://perma.cc/QYH6-SWER (permanent link).

72.    Defendant Andrew R. Wheeler, EPA Administrator, is the highest-ranking official in the EPA. Administrator Wheeler signed the 401 Rule on June 1, 2020. The Conservation Groups sue Administrator Wheeler in his official capacity.

## LEGAL BACKGROUND

### I.    The Administrative Procedure Act

73.    The Administrative Procedure Act "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)).

74.    The Act prohibits policy change based on "political winds and currents" without "at least some fidelity to law and legal process." *N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 772 (4th Cir. 2012) (Wilkinson, J., concurring); *see also United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950) (describing the Administrative Procedure Act as "a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices."); *S.C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959, 967 (D.S.C. 2018) ("To allow th[is] type of administrative evasiveness . . . would allow government to become a matter of the whim and caprice of the bureaucracy." (citations and quotations omitted)), *appeal dismissed*, No. 18-1964 (4th Cir. Feb. 4, 2019).

75.    The Administrative Procedure Act requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power,

privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A)– (D).

76.     When an agency departs from past practice, the agency must, among other things, acknowledge the change in policy and provide "good reasons" for it, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); provide a "reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983); and demonstrate that the new policy is itself consistent with the governing statute, *Fox*, 556 U.S. at 515.

77.     The Administrative Procedure Act requires courts to vacate an agency rule if it does not comport with these principles. 5 U.S.C. §§ 706(2) (reviewing courts "shall . . . set aside" unlawful agency action); *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("We have made clear that when a reviewing court determines that the agency regulations are unlawful, the ordinary result is that the rules are vacated . . . ." (citations and quotations omitted)).

**II.     The Clean Water Act**

**a.  Cooperative Federalism to Protect Clean Water**

78.     The Clean Water Act's "objective … is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

79.     To fulfill that goal, Congress established an overlapping set of state and federal protections.

80.     Section 301, for example, prohibits discharges of a pollutant from a point source to "waters of the United States" without authorization pursuant to the Act, such as a National

Pollutant Discharge Elimination System ("NPDES") permit under section 402. 33 U.S.C.

§§ 1311(a), 1362(7). Similarly, under section 404, a project expected to cause the discharge of

dredged or fill material into "waters of the United States"—such as for filling wetlands before a

construction project—requires a permit from the Corps. *Id.* § 1344.

81.    Though the section 301 prohibition on unpermitted discharges is federal law, the

Act allows states to assume primary responsibility for implementing and operating NPDES

permit programs. *Id.* § 1342(b). Except for three states, the District of Columbia, and U.S.

territories, the states have assumed the section 402 permitting program. When there is no state or

tribe with approved permitting authority, like in New Mexico, EPA issues NPDES permits.

82.    Likewise, the Act divides responsibility for specific standards and effluent

limitations between state and federal authorities. EPA establishes and enforces effluent

limitations based on the pollutant reduction various control technologies can achieve. *Id.*

§§ 1311, 1314. It is the responsibility of states, however, to establish water quality standards that

may go beyond technology-based standards to protect designated water uses such as swimming,

fishing, habitat protection, and drinking water supply. *Id.* §§ 1311(b)(1)(C), 1313.

83.    Once in place, these designated uses must be "maintained and protected" under

the Act's antidegradation policy. *See* 33 U.S.C. § 1313(d)(4)(B); 40 C.F.R. § 131.12. EPA has

explained that under its antidegradation regulation, "no activity is allowable . . . which could

partially or completely eliminate any existing use." *PUD No. 1*, 511 U.S. at 718–19 (citing EPA,

Questions and Answers on Antidegradation 3 (Aug. 1985)).

84.    And while the Act extends federal protections to all "waters of the United States,"

the Act also expressly grants the states the authority to issue or grant water quality certifications

under section 401 to protect the waters within their borders, as described below, and preserves

state authority to control discharges into their groundwater and manage non-point source pollution, such as agricultural runoff. *See Cty. of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1471 (2020).

85.    The Act further makes clear that, "except as expressly provided . . . nothing . . . shall . . . be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States." 33 U.S.C. § 1370.

### b.  Section 401

86.    In section 401, 33 U.S.C. § 1341, Congress gave states the express power and the responsibility to object to any federal permits or licenses for activities or projects within their borders if those activities or projects violate the Clean Water Act or state law. It further empowered states to set conditions to ensure compliance if the project moves forward.

87.    Under the Act, "[a]ny applicant for a Federal license or permit to conduct any activity . . . , which may result in *any discharge* into the navigable waters, shall provide the licensing or permitting agency a certification from the State." 33 U.S.C. § 1341(a)(1) (emphasis added). The certification must include conditions necessary to ensure that "*any applicant* . . . will comply" with enumerated provisions and "any other appropriate requirement of State law." *Id.* § 1341(d) (emphasis added).

88.    Federal permits and licenses subject to the 401 certification requirement include Clean Water Act section 402 pollutant discharge permits when they are issued by EPA (rather than by a state exercising delegated authority from EPA) and section 404 permits issued by the Corps for the discharge of dredged or fill materials into "waters of the United States." But section 401's certification requirement also applies to non–Clean Water Act permits, such as licenses from the Federal Energy Regulatory Commission for natural gas pipelines and

hydropower dams, and licenses from the Nuclear Regulatory Commission to build and operate reactors or dispose of nuclear waste.

89.    Under the Act, a state has four options with regard to a request for certification: it can grant, grant with conditions, deny, or waive its authority to review the certification.

90.    If a state grants a certification request, its certification "shall" include conditions "to assure that any applicant" will comply with various Clean Water Act limitations and standards "and with any other appropriate requirement of State law." *Id.* § 1341(d).

91.    Any conditions the state imposes when it grants a certification "shall become a condition on any Federal license or permit." *Id.*

92.    If a state denies a certification, "[n]o license or permit shall be granted." *Id.* § 1341(a)(1).

93.    When a state receives a request for certification from the applicant for a permit or license, it must act "within a reasonable period of time (which shall not exceed one year)" or it waives its certification authority. *Id.*

94.    States must establish procedures for public notice and, as they deem appropriate, public hearings. *Id.*

95.    State certification under section 401 "is one of the primary mechanisms through which [states] may exercise [their] role [under the Act] . . . as the prime bulwark in the effort to abate water pollution." *Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 971 (D.C. Cir. 2011) (citations and quotations omitted).

96.    "Every Circuit to address [section 401] has concluded that 'a federal licensing agency lacks the authority to reject'" a state's exercise of its certification authority. *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 646 (4th Cir. 2018) (collecting cases); *see also Am.*

*Rivers, Inc. v. FERC*, 129 F.3d 99, 110–11 (2d Cir. 1997) ("[A federal licensing agency] does not possess a roving mandate to decide that substantive aspects of state-imposed conditions are inconsistent with the terms of § 401.").

97.     Federal agencies are "limited to awaiting, and then deferring to, the final decision of the state. Otherwise, the state's power to block the project would be meaningless." *City of Tacoma v. FERC*, 460 F.3d 53, 67 (D.C. Cir. 2006).

98.     If a project applicant disagrees with a condition in, or denial of, a water quality certification, it may seek judicial review. *See, e.g.*, *Roosevelt Campobello Int'l Park Comm'n*, 684 F.2d 1041, 1056 (1st Cir. 1982) ("[T]he proper forum to review the appropriateness of a state's certification is the state court."); *Keating v. FERC*, 927 F.2d 616, 622–23 (D.C. Cir. 1991) (collecting cases and noting "a number of courts have held that disputes over [state conditions], *at least so long as they precede the issuance of any federal license or permit*, are properly left to the states themselves" (emphasis in original)); *Am. Rivers*, 129 F.3d at 112; *Del Ackels v. EPA*, 7 F.3d 862, 867 (9th Cir. 1993).

99.     Members of the public likewise may seek review of certification decisions in court or before administrative bodies. *See, e.g.*, *Appalachian Voices v. State Water Quality Control Bd.*, 912 F.3d 746, 752–53 (4th Cir. 2019).

### c.  Supreme Court Precedent

100.    The Supreme Court has twice affirmed that section 401 gives states robust authority to protect their waters. In *PUD No. 1*, a seven-Justice majority of the Court held that section 401(d) empowers a state to place "conditions and limitations on the [proposed] activity as a whole," rather than only on specific point source discharges of pollutants. 511 U.S. at 711–12.

101.    The Court noted that section 401(a) states the "threshold condition" for when a

project requires a certification: if it "may result in any discharge into the navigable waters." *Id.* at 707, 712. It found a meaningful difference between the statute's use of "discharge" in subsection (a), to describe what triggers the certification requirement, and subsection (d)'s use of "applicant," a broader term, when stating what states may condition as part of a certification. *Id.* at 711.

102.    As the Court put it, "[t]he language of this subsection contradicts petitioners' claim that the State may only impose water quality limitations specifically tied to a 'discharge.' The text refers to the compliance of the applicant, not the discharge. Section 401(d) thus allows the State to impose 'other limitations' on the project in general." *Id.*

103.    On that reasoning, the Court held that the state of Washington had authority to impose conditions on a hydropower license requiring the project applicant to maintain a minimum stream flow to protect designated uses. Justice O'Connor wrote for the Court, joined by Chief Justice Rehnquist and Justices Blackmun, Stevens, Kennedy, Souter, and Ginsburg. Only two Justices dissented.

104.    Although the Court found its answer in the plain text of the Clean Water Act, the Court confirmed that its statutory interpretation was "consistent with" EPA's existing regulations implementing 401. Those regulations required states to establish "a reasonable assurance that the *activity* will be conducted in a manner which will not violate applicable water quality standards." *Id.* at 712 (quoting 40 C.F.R. § 121.2(a)(3) (1993)) (emphasis in original).

105.    In *S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370 (2006), the Supreme Court addressed what counts as a "discharge" under section 401(a)(1) to trigger the requirement to obtain a certification.

106.    The Court unanimously held the term "discharge" in section 401 had a different

and broader meaning than "discharge of a pollutant"—a term of art used elsewhere in the Act and limited to point sources. *Id.* at 376. "'[D]ischarge' presumably is broader, else superfluous," the Court concluded, and must be given "its ordinary or natural meaning.'" *Id.* (quoting *FDIC v. Meyer*, 510 U.S. 471, 476 (1994)).

107.    Because a "discharge" need not involve a pollutant to fall within section 401's ambit, the Court held that permitting for a hydroelectric dam that does not discharge a "pollutant" under the Act falls within section 401. *Id.*

### d. EPA Guidance

108.    EPA's guidance has long recognized the broad authority that section 401 grants to states.

109.    Under EPA's 1989 Guidance, "[a]ny activity, including, but not limited to, the construction or operation of facilities which *may* result in *any discharge* requires water quality certification." EPA, *Wetlands and 401 Certification—Opportunities and Guidelines for States and Eligible Indian Tribes*, 20 (1989) ("1989 Guidance") (emphasis in original).

110.    The 1989 Guidance provided for thorough state review: "all of the potential effects of a proposed activity on water quality—direct and indirect, short and long term, upstream and downstream, construction and operation—should be part of a State's certification review." *Id.* at 23.

111.    The 1989 Guidance provided examples of conditions that states had successfully placed on 401 certifications. These included sediment control plans, stormwater controls, protections for threatened species, and noxious weed controls. *Id.* at 24, 54–55.

112.    EPA noted, without disapproval, that "few of these conditions [were] based directly on traditional water quality standards," while others were based on "State or local law related to water quality." *Id.* at 24. According to EPA, "all [of these conditions] are valid." *Id.*

113.    The 1989 Guidance narrowly described instances when a state would waive its authority to review: a waiver would be deemed to have occurred only if a state fails to act within "a reasonable period of time (which shall not exceed one year) after receipt" of a certification request. *Id.* at 31.

114.    The 1989 Guidance also advised states to adopt regulations to ensure that applicants submit sufficient information to make a decision and encouraged a requirement that "link[s] the timing for review to what is considered receipt of a *complete application*." *Id.* (emphasis added).

115.    EPA issued additional section 401 guidance in April 2010, which continued to affirm the agency's broad interpretation of states' authority under section 401. *See* EPA, *Clean Water Act Section 401 Water Quality Certification: A Water Quality Protection Tool for States and Tribes* (2010) ("2010 Guidance").

116.    The 2010 Guidance cited the Supreme Court's decision in *PUD No. 1* and stated that "once § 401 is triggered, the certifying state or tribe may consider and impose conditions on the project activity in general, and not merely on the discharge, if necessary to assure compliance with the CWA and with any other appropriate requirement of state or tribal law." *Id.* at 18.

117.    The 2010 Guidance explained that "the range of potential conditions . . . extend[s] to any provision of state or tribal law relating to the aquatic resource." *Id.* at. 23. The 2010 Guidance referred to North Carolina and Georgia examples as bases for conditions:

> For example, North Carolina has developed a list of assessment formulas and general certification conditions relating to project impacts, buffers, violation sites, stormwater, surface water classifications, dams and ponds, wetlands and others that are reviewed for applicability to each project, so that all projects are held to the same standards and undergo the appropriate level of scrutiny. In Georgia, coordination between the certifying agency and the state fish and wildlife agencies has led to certification conditions designed to protect state species of concern that are tied to water quality goals in state law.

*Id*. at 18–19.

## FACTS

### I.     President Trump's Executive Order

118.     Though section 401 ensures protections from a wide variety of federally-licensed activities and projects, this Rule arose from the White House's desire to fast-track certain fossil fuel projects like pipelines and coal export terminals.

119.     On April 10, 2019, the President issued an Executive Order directing the process that culminated fifteen months later in this Rule. Exec. Order No. 13,868, 84 Fed. Reg. 15,495 (April 10, 2019) (Section 1).[1]

120.     The Order set a quick timeline for EPA to overhaul section 401. The Order directed EPA to review existing regulations and guidance on 401 certifications and, within 60 days, issue interim revised guidance—both for itself and other federal agencies. *Id*. at 15,496 (Section 3(b)).

121.     Next, the Order directed EPA to propose revisions to the regulations implementing section 401 to bring them in line with the priorities of the Order within 120 days. *Id.* (Section 3(c)).

122.     The Order directed EPA to finalize the proposed 401 rule within 13 months. *Id.*

123.     The Order declared that EPA's new 401 rule should set the standard not just for EPA but for all federal agencies issuing licenses and permits subject to 401 certification. Within 90 days of the 401 Rule becoming final, other federal agencies "shall initiate a rulemaking to

_____

[1] S*ee also* Dominion Energy, Meeting Handout, Docket Id. EPA-HQ-OW-2019-0405-0006 (June 27, 2019).

ensure their respective agencies' regulations are consistent" with this Rule and the goals of the executive order. *Id.* (Section 3(d)).

124.    EPA came close to meeting the Order's short deadlines. On June 7, it proposed interim guidance. EPA, *Clean Water Act Section 401 Guidance For Federal Agencies, States And Authorized Tribes* (June 7, 2019). On August 22, 2019, it issued the proposed 401 rule. And on July 13, 2020, the final 401 Rule was published in the Federal Register.

## II.    Proposed 401 Rule

125.    EPA proposed its overhaul of section 401 water quality certifications on August 22, 2019, noting the Executive Order and EPA's proposal came in response to "several high-profile infrastructure projects." Updating Regulations on Water Quality Certifications, 84 Fed. Reg. 44,080, 44,081. EPA gave the public a mere 60 days to comment, which is considered the bare minimum time agencies should provide to the public for notice-and-comment rulemaking.

126.    EPA's proposal addressed every step of the 401 certification process, from before a project proponent requests certification to after the state or tribe grants or denies it.

127.    Central to EPA's concept was its definition of "scope of certification"—a newly invented term that appears nowhere in section 401, but that EPA would use to stifle state attempts to exercise the full range of authority the Clean Water Act gives them, and public attempts to make sure states exercise that authority. 84 Fed. Reg. 44,120 (Proposed 40 C.F.R. § 121.3).

128.    Though EPA cited "confusion and uncertainty" to justify the rule, EPA itself observed in supporting documents that "the average length of time for states to issue a

certification decision once they receive a complete request is 132 days."[2] EPA also
acknowledged that when delays do occur, they are most often due to incomplete information
from the applicant. In North Carolina, for example, of more than 2,500 certifications issued
between July 1, 2015, and June 30, 2017, about 90 percent were issued within 60 calendar days.[3]

129.    EPA nonetheless proposed to start the clock on 401 certification decisions not
when the agency has the information it needs to be sure a project "will comply" with federal and
state law, but when the project applicant initially submits a certification request that includes
only a bare-bones set of information. 84 Fed. Reg. 44,120 (proposed 40 C.F.R. § 121.5(b)). If a
state requests additional information from the applicant, that request will not toll a state's
deadline for granting or denying a certification. 84 Fed. Reg. 44,107.

130.    Most boldly, EPA purported to let federal agencies veto a state's denial of
certification and strip a state's conditions on certification if the agency found them outside the
new, and much narrower, "scope of certification." 84 Fed. Reg. 44,121 (proposed 40 C.F.R.
§ 121.6(c)); 84 Fed. Reg. 44,104–06.

131.    The only support EPA offered for its plan to undermine certification authority was
an "Economic Analysis" with no meaningful analysis, economic or otherwise.

132.    As EPA admitted, the Economic Analysis was a "qualitative" review based on
"four case studies"—examples of "high-profile" certifications that industry and the Trump

---

[2] EPA, Economic Analysis for the Proposed Clean Water Act Section 401 Rulemaking, Docket
Id. EPA-HQ-OW-2019-0405-0022, at 6 (Aug. 2019) (summarizing Association of Clean Water
Administrators survey results).
[3] Letter from Sheila C. Holman, Assistant Secretary for the Environment, N.C. Department of
Environmental Quality, to The Hon. Andrew Wheeler, Administrator, U.S. EPA, RE: U.S.
EPA's Review of Clean Water Act Section 401 Guidance and Regulations, Docket Id. EPA-HQ-
OW-2018-0855-0073, at 2 (May 24, 2019).

administration disagreed with or felt had taken too long. 84 Fed. Reg. 44,117; Econ. Analysis at 11. EPA devoted most of the document to hypothesizing what impacts its proposed rule would have had on these few past certifications.

133.    Nonetheless, the EPA disclaimed any reliance on its Economic Analysis. *See* 84 Fed. Reg. 44,117 ("While the economic analysis is informative in the rulemaking context, the EPA is not relying on the analysis as a basis for [the] proposed rule.").

134.    The public submitted more than 125,000 comments on EPA's proposal.

**III.    Final Rule**

135.    EPA finalized its 401 Rule on June 1, 2020, missing the Executive Order's thirteen-month deadline by just a few weeks. The Rule was published in the Federal Register on July 13, 2020. 85 Fed. Reg. 42,210.

136.    The final 401 Rule largely followed EPA's proposal, dismantling states' authority at every step.

137.    As the Executive Order directs, other federal agencies are now required to revise their own regulations to conform to EPA's Rule. 85 Fed. Reg. 42,214.

**a.    Scope of Certification**

138.    Beginning with the basic question of when certification is required, the final Rule lets projects escape state review and public input.

139.    Under the Rule, a certification is required when a project "may result in a discharge"—with discharge now meaning only *point source* discharges into "waters of the United States." 85 Fed. Reg. 42,285 (to be codified at 40 C.F.R. §§ 121.1(f), 121.2); *see also id*. at 42,237–38.

140.    Next, EPA finalized its proposal to defy the Supreme Court's holding in *PUD No. 1* and limit states to imposing conditions on a discharge (from a "point source" into "waters of

the United States" only) rather than on the "applicant," as 401(d) requires.

141.    As it proposed, EPA established the concept of a "scope of certification," for which no statutory equivalent exists. The term imposes two main limits: states may only consider impacts from a "discharge"—narrowed to include only "point source" discharges "into waters of the United States;" and they may only impose conditions to ensure these discharges will comply with "water quality requirements"—narrowed to mean only federal effluent limitations and standards and state or tribal "regulatory requirements for point source discharges into waters of the United States." 85 Fed. Reg. 42,285 (to be codified at 40 C.F.R. §§ 121.3, 121.1(f), 121.1(n)).

142.    Furthermore, EPA limits "appropriate requirements of state law" to not only "water quality requirements" but a set of water quality requirements so narrow as to be redundant with the National Pollutant Discharge Elimination System permitting program, which already covers point source discharges into "waters of the United States."

143.    No longer can states impose conditions on the project "activity as a whole" to protect waters within the state, as the Supreme Court in *PUD No. 1* understood section 401 to authorize. 511 U.S. at 712; *see also* 1989 Guidance at 22; 2010 Guidance at 18.

144.    This "scope of certification" provision prohibits states from considering or conditioning pollution from non-point sources (like sedimentation and stormwater) or pollution into state waters that do not fit the administration's new, restrictive view of "waters of the United States." This unprotected category includes many streams and wetlands, as well as groundwater, which many state residents "rel[y] heavily upon . . . for drinking water." S.C. Code Ann. Regs. 61-68(H)(2).

145.    Indeed, EPA expressly and unlawfully takes its reasoning from Justice Thomas's

34

two-Justice *dissent* in *PUD No. 1*, which concludes that section 401 conditions "must . . . be related to discharges," rather than from the seven-justice majority opinion. 85 Fed. Reg. 42,231, 42,233; 84 Fed. Reg. 44,097 (citing *PUD No. 1*, 511 U.S. at 726–27 (Thomas, J., dissenting)).

146.    EPA did not evaluate how drastically reducing the scope of state review and conditions would affect water quality or the communities that use and enjoy local waters. Rather, it merely mentioned that other environmental review and permitting programs exist, and insisted that the authority section 401 grants to states "is limited." 85 Fed. Reg. 42,252–53.

### b. Federal Agency Veto

147.    Like the proposal, the final 401 Rule attempts to give federal agencies veto power over state 401 decisions. However, the final Rule purportedly limits the veto to review for "procedural" compliance with the Rule. 85 Fed. Reg. 42,286 (to be codified at 40 C.F.R. §§ 121.9, 121.10); *see also id.* at 42,267.

148.    Federal agencies may now deem a certification waived or a condition invalid if in their view states violate their supposedly procedural obligations to explain how their decisions follow the Rule's substantive limits. *Id.*

149.    For example, when a state imposes conditions, it must explain why a condition is "necessary." 85 Fed. Reg. 42,286 (to be codified at 40 C.F.R. § 121.7(d)(1)(i)).

150.    Defying section 401's command that state conditions "shall" become part of the federal permit, the new Rule authorizes federal agencies to ignore state conditions they disagree with and license the project over the state's objection or without the state's supposedly deficient condition. *Id.* at 42,263, 42,286 (to be codified at 40 C.F.R. §§ 121.7, 121.9).

151.    In this way, the new Rule transfers review of state agency decisions from the state administrative process and judicial review to the federal agencies, thereby giving the federal agencies authority over the states and local interests in a manner that the Clean Water Act

prohibits. The new Rule takes away from local residents and community groups, including the

Conservation Groups, their ability and rights to participate in reviews of 401 certifications in

local state administrative fora and state courts and forces them into additional review or litigation

before a federal agency and then federal courts, often out of state.

### c. Timing, Information, and Public Participation

152.    As the proposal did, EPA's final Rule compels states to issue rushed decisions

based on incomplete information.

153.    Under the Rule, states' statutory "reasonable time" limit for granting, denying, or

waiving a certification begins when a project applicant initially submits a "certification request."

154.    The only substantive information required in a "certification request" is: "the

location and nature of any potential discharge that may result from the proposed project and the

location of receiving waters;" and "a description of any methods and means proposed to monitor

the discharge and the equipment or measures planned to treat, control, or manage the discharge."

85 Fed. Reg. 42,285 (to be codified at 40 C.F.R. § 121.5(b)(4), (5)).

155.    As noted above, EPA limits "discharge" to only point source discharges to

"waters of the United States." *Id.* (to be codified at 40 C.F.R. § 121.1(f)).

156.    This "certification request" provision limits the information states are entitled to

receive from applicants to certain basic information about point source discharges, and triggers

the time for state review upon receipt of an applicants' initial submission, even if it is inaccurate

or incomplete. Indeed, EPA emphasized that states may not use their own regulations to expand

certification request requirements, and suggested that states should change their regulations to

match EPA's new Rule. *See* 85 Fed. Reg. 42,248–49.

157.    As a result, states will be forced to make rushed decisions based on incomplete

information. The Conservation Groups and other members of the public likewise have no way to

evaluate and comment on the full set of harms section 401 obligates states to consider.

158.    EPA's timing and certification request requirements now override the timing requirements for public notice and comment periods established in state law. *E.g.*, 9 Va. Admin. Code § 25-210-140(B) (requiring under Virginia law that the public must be provided "at least 30 days" to comment on a draft Virginia Water Protection permit (which serves as the state's certification of a project under section 401)); *see also* Va. Code § 62.1-44.15:20(C) (requiring a 45-day comment period for state agencies to weigh in on section 401 conditions).

159.    Moreover, although for decades federal agencies have been *permitted* to establish a "reasonable time" for states to make their certification decisions short of the year provided by section 401 itself, the new Rule *requires* them to set how long that "reasonable time" period will be, either project-by-project or categorically through rulemaking. 85 Fed. Reg. 42,285 (to be codified at 40 C.F.R. § 121.6(a)).

160.    In its final Rule, EPA provided no meaningful response to the comments received criticizing the "certification request" criteria as far too narrow to allow states to thoroughly evaluate impacts on their waters and make a certification decision. Rather EPA stated that this limited set of information was sufficient for states to "begin" their review. But it did not acknowledge that, if a bare-bones certification request started the clock ticking for states to decide, project applicants could resist or delay fulfilling further information requests from a state, depriving state officials and the public of information needed to ensure a project meets applicable requirements. *See* 85 Fed. Reg. 42,243–48.

161.    The final 401 Rule rewrites regulations that have been in place for 49 years to protect the role of states, tribes, and the public to weigh in on federally sanctioned projects and ensure the projects' compliance with state federal and law. The Rule is unlawful under the Clean

Water Act and the Administrative Procedure Act, and it must be set aside.

## FIRST CLAIM FOR RELIEF

### Violation of the Clean Water Act and Administrative Procedure Act—
### Unlawful Restriction of Scope of Review

162.    The allegations of the preceding paragraphs are incorporated by reference.

163.    As the United States Supreme Court has held, the plain language of the Clean Water Act authorizes states making 401 certification decisions to consider the impacts of the proposed activity as a whole, rather than just specific discharges. *PUD No. 1*, 511 U.S. at 712.

164.    In violation of the plain language of the Clean Water Act and controlling Supreme Court precedent, the 401 Rule unlawfully limits the scope of state certifications to the "discharge" alone. 85 Fed. Reg. 42,285 (to be codified at 40 C.F.R. § 121.3); *see also PUD No. 1*, 511 U.S. at 711–712.

165.    The Rule's limit to conditions on discharges, rather than the activity as a whole, is all the more illegal because it further narrows "discharges" to "point source" discharges into "waters of the United States," when the statute contains no such limitations. 85 Fed. Reg. 42,285 (to be codified at 40 C.F.R. § 121.1(f)); *see S.D. Warren*, 547 U.S. at 375–76; 33 U.S.C. § 1341(d).

166.    The 401 Rule thus prevents the states from protecting local communities, local concerns, groundwater, waters of the state, and even "waters of the United States" from injury beyond the effects of a specified discharge, in violation of the plain language of the statute and controlling decisions of the United States Supreme Court.

167.    Accordingly, the 401 Rule also violates the Administrative Procedure Act because it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), and is "arbitrary, capricious, an abuse of discretion, [and] otherwise not in

accordance with law." *Id.* § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### Violation of Clean Water Act and Administrative Procedure Act— Unlawful Restriction of Permissible 401 Conditions

168.    The allegations of the preceding paragraphs are incorporated by reference.

169.    When a state grants a certification, that certification "shall set forth" limitations "necessary to assure that any applicant for a Federal license or permit will comply with [enumerated requirements] or any other appropriate requirement of State law." 33 U.S.C. § 1341(d).

170.    The Supreme Court, in *PUD No. 1*, did not address the full extent of "any other appropriate requirement of state law." 511 U.S. at 713. However, it rejected the dissent's suggestion that this phrase only covers requirements related to discharges. *Id.* at 713 n.3.

171.    Contradicting the majority in *PUD No. 1*, the 401 Rule implements an impermissibly narrow reading of "any other appropriate requirement of state law." Under the Rule, the only state law conditions that states may put in place are those that relate to "water quality requirements" "for point source discharges into waters of the United States." 85 Fed. Reg. 42,250, 42,285 (to be codified at 40 C.F.R. §§ 121.3; 121.1(n)).

172.    The final Rule's prohibition of all other conditions violates the Clean Water Act's requirement that states ensure a project applicant—not just discharge, much less point source discharge into "waters of the United States"—complies with "any other appropriate requirement of state law." In doing so, it deprives the Conservation Groups, their members, and the public of the right to advocate for the full scope of protections section 401 provides.

173.    For these reasons, the 401 Rule also violates the Administrative Procedure Act because it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory

right," 5 U.S.C. § 706(2)(C), and is "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law." *Id.* § 706(2)(A).

### THIRD CLAIM FOR RELIEF

**Violation of the Clean Water Act and the Administrative Procedure Act—
Restricting Public Participation in Violation of Statute**

174.    The allegations of the preceding paragraphs are incorporated here by reference.

175.    The Clean Water Act mandates public notice and provides for public hearings when appropriate in the 401 certification process. 33 U.S.C. § 1341(a)(1); *see also id.* § 1251(e) ("Public participation . . . shall be provided for, encouraged, and assisted by the Administrator and the States.").

176.    Pursuant to that mandate, states have established public participation procedures as part of their 401 programs.

177.    The Conservation Groups and their members have actively participated in the section 401 certification process, do so as a regular part of their mission and operations, and will do so in the future after the effective date of the 401 Rule.

178.    In violation of the Clean Water Act, the 401 Rule denies to the Conservation Groups and their members their rights to public notice and participation in the section 401 process, as set out in the Clean Water Act.

179.    As set out in the First Claim for Relief, the 401 Rule unlawfully restricts the scope of certification decisions to the impacts of specific point source discharges to "waters of the United States." As set out in the Second Claim for Relief, the 401 Rule unlawfully restricts the conditions that states may impose and local interests that states may protect. As set out in the Sixth Claim for Relief, the 401 Rule unlawfully exempts applicants and projects from 401 review entirely based on an illegal definition of "discharge."

180.    Thereby, the Rule prevents the Conservation Groups and their members from advocating, as they have done in the past, for certifications and conditions to avoid or mitigate harms from applicants and activities to communities, local concerns, groundwater, waters of the state, waters left unprotected by the Replacement Rule (such as certain wetlands like Carolina Bays, and headwater and ephemeral streams), and waters threatened by nonpoint source pollution like agricultural runoff.

181.    In addition, as detailed in the Fourth Claim for Relief, the 401 Rule for the first time defines a "certification request," letting project applicants leave out information needed by and formerly required by states to certify that a project "will comply" with applicable laws, 33 U.S.C. § 1341(a)(1), and to set forth conditions "necessary to assure that [the project] will comply" with applicable laws *and* "with any other appropriate requirement of State law," 33 U.S.C. § 1341(d).

182.    The 401 Rule also requires that submission of an inadequate or inaccurate "certification request" starts the running of a hard one-year time period, which sets the outer limit for how long a state can consider a certification request.

183.    These limitations on the information and timing of a 401 certification unlawfully restrict state authority. They also deny the public the rights guaranteed by section 401 to comment upon certification requests and submit full and informed comments. Without adequate information and adequate time, the public cannot meaningfully review and comment upon certification requests, just as the states cannot meaningfully review and decide upon them.

184.    By thus denying the public, the Conservation Groups, and their members their rights to public notice and participation guaranteed by the Clean Water Act, the 401 Rule also violates the Administrative Procedure Act because it is "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), and is "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law." *Id.* § 706(2)(A).

## FOURTH CLAIM FOR RELIEF

### Violation of the Clean Water Act and the Administrative Procedure Act—
### Unlawful Restriction of 401 Certification Procedures

185.    The allegations of the preceding paragraphs are incorporated here by reference.

186.    To comply with the Administrative Procedure Act, an agency must demonstrate that the new policy it adopts is consistent with the governing statute. *Fox*, 556 U.S. at 514–15.

187.    Under section 401, states must certify that a federally licensed or permitted project or activity "will comply" with applicable laws. 33 U.S.C. § 1341(d); *see also* § 1341(a).

188.    States must also establish procedures for public notice and, "to the extent [they] deem[] appropriate, procedures for public hearings." *Id.* § 1341(a).

189.    States cannot ensure federally licensed projects "will comply" with applicable laws without timely, complete information about a project from the applicant and meaningful input from the public based on that information.

190.    The 401 Rule unlawfully hinders public participation and states' ability to ensure compliance by:

a.  Defining a "certification request" to exclude the full information necessary to determine whether a project or activity "will comply" with applicable laws, 33 U.S.C. § 1341(a)(1), and set forth conditions "necessary to assure that [it] will comply" with applicable laws *and* "with any other appropriate requirement of State law," 33 U.S.C. § 1341(d). *See* 85 Fed. Reg. 42,285 (to be codified at 40 C.F.R. §§ 121.1(c); 121.5(b), (c));

b.  Requiring the federal agency issuing a license or permit to establish a "reasonable time" for the state's decision, *id.* (to be codified at 40 C.F.R. § 121.6(a)), and starting the

"reasonable time" limit when a certification request is received, without regard to whether states have received necessary information or complied with state public participation procedures, *id.* (to be codified at 40 C.F.R. §§ 121.1(c), (l), (m), 121.6).

191.    These unauthorized limits on the section 401 process violate the Clean Water Act by making it impossible for states to certify that projects or activities "will comply" with applicable laws, and for the public to effectively review and participate in 401 certification decisions and ensure the state has met its obligation.

192.    For these reasons, the 401 Rule also violates the Administrative Procedure Act because it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), and is "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law." *Id.* § 706(2)(A).

## FIFTH CLAIM FOR RELIEF

### Violation of the Clean Water Act and the Administrative Procedure Act—
### Unlawful Federal Agency Veto of Certification Decisions

193.    The allegations of the preceding paragraphs are incorporated here by reference.

194.    The Clean Water Act commands that "[n]o license or permit shall be granted if certification has been denied." 33 U.S.C. § 1341(a)(1).

195.    Likewise, if a state grants certification, but with conditions, those conditions "shall become" part of the permit or license. *Id.* § 1341(d).

196.    For the first time, the 401 Rule gives federal agencies the ability to veto and override state 401 certifications through "procedural review" of water quality certifications.

197.    When Congress enacted the Clean Water Act, it did not give federal agencies any right of review of certification decisions. Instead, it provided states the right of certification, mandated that a state denial prevents the issuance of a federal license or permit, and mandated

that any state conditions shall become part of the permit or license.

198.    This misappropriation of state authority to federal agencies violates the Clean Water Act.

199.    This unlawful veto also undercuts the finality of decisions that reflect public comments and participation, minimizing the input of the Conservation Groups and their members. And, by unlawfully giving federal agencies the right to overrule state agency decisions, the Rule in those instances denies the Conservation Groups and their members their rights to participation and a final decision in state administrative fora and state courts, rather than federal agencies and federal courts, when state agency decisions are under challenge.

200.    In all these ways, the Rule is also "arbitrary, capricious, an abuse of discretion," and "not in accordance with law" and "in excess of statutory jurisdiction" in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2).

## SIXTH CLAIM FOR RELIEF

### Violation of Clean Water Act and Administrative Procedure Act—
### Unlawful Limitation of When Section 401 Applies

201.    The allegations of the preceding paragraphs are incorporated here by reference.

202.    Section 401 of the Clean Water Act requires that "[a]ny applicant for a Federal license or permit to conduct any activity. . . which *may result in any discharge* into the navigable waters," must obtain a certification from the state where the activity would be located. 33 U.S.C. § 1341(a) (emphasis added).

203.    In *S.D. Warren*, the Supreme Court of the United States held that the term "discharge" in section 401(a)(1) has a different, and broader, meaning than the term "discharge of a pollutant," which the Clean Water Act limits to point sources. 547 U.S. at 375–76.

204.    Rather, the Supreme Court has repeatedly and unanimously made clear that section 401's "threshold condition" of an actual or potential "discharge" must be understood in its ordinary meaning, as a "flowing or issuing out." *Id.* at 376; *PUD No. 1*, 511 U.S. at 712; *see also id.* at 725 (Thomas, J., dissenting).

205.    Nonetheless, in the 401 Rule, EPA declared that a certification is required only when potential exists for a "point source discharge" into "waters of the United States," not a "discharge" in the ordinary sense as the Supreme Court unanimously understood the term. 85 Fed. Reg. 42,285 (to be codified at 40 C.F.R. §§ 121.2, 121.1(f)).

206.    By unlawfully restricting state review to projects with an actual or potential point source discharge, instead of a discharge under the ordinary meaning of the term, EPA has violated the Clean Water Act and contradicted Supreme Court precedent. This restriction of when section 401 applies deprives the Conservation Groups and their members, and the general public, of the information, opportunity for input, and protections that the 401 process provides. It also unlawfully limits authority that Congress granted to states.

207.    In all these ways, the Rule is also "arbitrary, capricious, an abuse of discretion," and "not in accordance with law" and "in excess of statutory jurisdiction" in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2).

## SEVENTH CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act

208.    The allegations of the preceding paragraphs are incorporated here by reference.

209.    The Administrative Procedure Act requires that agencies give "good reasons" for a change in policy, *Fox*, 556 U.S. at 515, rather than changing based on "whim and caprice," *S.C. Coastal Conservation League*, 318 F. Supp. 3d at 967.

210.    The 401 Rule jettisons a half-century of state and federal policy and practice, denying long-established public participation opportunities in the state certification process and its review, based on arbitrary and capricious decisionmaking.

211.    The Rule claims to promote regulatory certainty, ignoring its own record evidence that the new restrictions may spur *more* delay and uncertainty by giving states no option but to deny certifications.

212.    Additionally, by failing to consider how constraining the 401 certification process will affect "the chemical, physical, and biological integrity of the Nation's waters," EPA "entirely failed to consider an important aspect of the problem."

213.    Nor did EPA adequately consider the impact of these changes upon public participation in state certification decisions or in their review.

214.    In these and other respects, EPA failed to meaningfully explain the reasoning underlying its dramatic change in policy.

215.    In all these ways, the 401 Rule and its adoption are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," violating the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

## REQUEST FOR RELIEF

The Conservation Groups respectfully request that the Court:

1.    Declare that the agencies acted arbitrarily and unlawfully in promulgating the challenged Rule, Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. 44,210 (July 13, 2020);

2.    Vacate and set aside the challenged regulation;

3.    Award the Conservation Groups their reasonable fees, costs, and expenses, including attorneys' fees, associated with this litigation; and

4.    Grant the Conservation Groups such further and additional relief as the Court may

deem just and proper.

Respectfully submitted this the 26th day of August 2020.

/s/ Frank S. Holleman III
D.S.C. Bar No. 1911
Frank S. Holleman III
fholleman@selcnc.org
Leslie Griffith*
lgriffith@selcnc.org
Kelly F. Moser*
kmoser@selcnc.org
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516-2356
Telephone: (919) 967-1450
Facsimile: (919) 929-9421

Attorneys for Plaintiffs

*Pro hac vice application forthcoming