**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| SOUTH CAROLINA COASTAL CONSERVATION LEAGUE, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> ANDREW R. WHEELER, in his official capacity as Administrator of the United States Environmental Protection Agency, *et al*., <br><br> Defendants, <br><br> AMERICAN PETROLEUM INSTITUTE, *et al*., <br><br> Defendant-Intervenors, <br><br> NATIONAL HYDROPOWER ASSOCIATION, <br><br> Defendant-Intervenors, <br><br> STATE OF LOUISIANA, *et al*., <br><br> Defendant-Intervenors. | Civil Action No. 2:20-cv-03062-DCN |

**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    BACKGROUND ....................................................................................................2

    A.  Statutory Background ................................................................................2

    B.  Regulatory Background................................................................................5

III.   STANDARD OF REVIEW ....................................................................................5

    A.  The Administrative Procedure Act .................................................................5

    B.  Summary Judgment ....................................................................................6

IV.    ARGUMENT .........................................................................................................6

    A.  EPA's Definition of "The Scope of Certification" is Reasonable and
        Consistent with the Clean Water Act. ..........................................................7

        1.   The Scope of Section 401 Certification Is Ambiguous and EPA's
            Interpretation Is Reasonable and Entitled to Deference. .........................7

        2.   EPA's Interpretation of the Scope of Certification under Section 401 Is
            Permissible under the Supreme Court's Decision in *PUD No. 1*.........................12

    B.  The Certification Rule Reasonably Provides for Certifying Authorities to Place
        Conditions on Certifications Related to "Water Quality Requirements." .................16

    C.  The Certification Rule Reasonably Clarifies when the "Reasonable Period of
        Time" Begins..............................................................................................19

    D.  The Certification Rule Reasonable Requires that Federal Agencies Conduct a
        Procedural Review of 401 Certification Conditions to Ensure Compliance with
        Section 401. ..............................................................................................24

    E.  The Certification Rule Properly Clarifies that "Discharge" means Discharge
        from a Point Source into Waters of the United States.................................................28

        1.   Into Waters of the United States.........................................................29

        2.   Point Source Discharges......................................................................30

V.     CONCLUSION......................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*Airport Communities Coalition* v. *Graves*,
    280 F. Supp. 2d 1207 (W.D. Wash. 2003) ................................................................ 25

*American Rivers v. FERC*,
    129 F.3d 99 (2d Cir. 1997) ................................................................ 23, 26, 32

*American Whitewater v. Tidwell*,
    770 F.3d 1108 (4th Cir. 2014) ................................................................ 7, 24

*Arkansas v. Oklahoma*,
    503 U.S. 91 (1992) ................................................................ 13, 21

*Avoyelles Sportsmen's League, Inc. v. Marsh*,
    715 F.2d 897 (5th Cir. 1983) ................................................................ 40

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................ 12

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
    467 U.S. 837 (1984) ................................................................ *passim*

*City of Tacoma, Washington* v. *FERC*,
    460 F.3d 53 (D.C. Cir. 2006) ................................................................ 33, 34, 35

*Cleveland v. United States*,
    329 U.S. 14 (1946) ................................................................ 23

*Colautti v. Franklin*,
    439 U.S. 379 (1979) ................................................................ 24

*Constitution Pipeline Co., LLC v. New York State Department of Environmental Conservation*,
    868 F.3d 87 (2d Cir. 2017) ................................................................ 29

*Defenders of Wildlife v. North Carolina Department of Transportation*,
    762 F.3d 374 (4th Cir. 2014) ................................................................ 8, 24

*Entergy Corp. v. Riverkeeper, Inc.*,
    556 U.S. 208 (2009) ................................................................ 11

*Gibbons v. Ogden*,
    22 U.S. (9 Wheat.) 1 (1824) ................................................................ 39

*Hoopa Valley Tribe v. FERC*,
913 F.3d 1099 (D.C. Cir. 2019) ............................................................. 1, 26, 29, 34

*Hughes River Watershed Conservancy v. Johnson*,
165 F.3d 283 (4th Cir. 1999) ....................................................................................... 7

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*,
309 F.3d 1181 (9th Cir. 2002) .................................................................................... 41

*Mayo Foundation for Medical Education & Research v. United States*,
562 U.S. 44 (2011) ...................................................................................................... 11

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto Insurance Co.*,
463 U.S. 29 (1983) ................................................................... 7, 13, 24, 28, 32

*National Cable & Telecommunications Ass'n v. Brand X Internet Services*,
545 U.S. 967 (2005) ....................................................... 12, 16, 18, 20, 48

*National Wildlife Federation v. Gorsuch*,
693 F.2d 156 (D.C. Cir. 1982) .................................................................................... 42

*Natural Resources Defense Council v. EPA*,
915 F.2d 1314 (9th Cir. 1990) .................................................................................... 44

*New York State Department of Environmental Conservation v. FERC*,
884 F.3d 450 (2d Cir. 2018) ........................................................................... 26, 27, 29

*Ohio Valley Environmental Coalition v. Hurst*,
604 F. Supp. 2d 860 (S.D. W. Va. 2009) ..................................................................... 8

*Omega World Travel, Inc. v. Mummagraphics, Inc.*,
469 F.3d 348 (4th Cir. 2006) ...................................................................................... 14

*Oregon Natural Desert Ass'n v. Dombeck*,
172 F.3d 1092 (9th Cir. 1998) ............................................................................. passim

*Oregon Natural Desert Ass'n v. United States Forest Service*,
550 F.3d 778 (9th Cir. 2008) ...................................................................................... 47

*Pronsolino v. Nastri*,
291 F.3d 1123 (9th Cir. 2002) .................................................................................... 41

*PUD No. 1 of Jefferson County v. Washington Department of Ecology*,
511 U.S. 700 (1994) ............................................................................................. passim

*Rapanos v. United States*,
547 U.S. 715 (2006) ............................................................................................... 42

*Resource Investments, Inc. v. U.S. Army Corps of Engineers*,
151 F.3d 1162 (9th Cir. 1998) ............................................................................... 41

*S.D. Warren Co. v. Maine Board of Environmental Protection*,
547 U.S. 370 (2006) .................................................................................. 25, 37, 41, 48

*Shanty Town Associates Limited Partnership v. EPA*,
843 F.2d 782 (4th Cir. 1988) ................................................................................ 45

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*,
531 U.S. 159 (2001) ......................................................................................... 39, 40

*Solis v. Cissna*,
No. CV 9:18-00083-MBS, 2019 WL 8219790 (D.S.C. July 11, 2019) ...................... 8

*Spartanburg General Hospital v. Heckler*,
607 F. Supp. 635 (D.S.C. 1985) .............................................................................. 8

*Stone v. INS*,
514 U.S. 386 (1995) ............................................................................................... 15

*United States v. Atlantic Research Corp.*,
551 U.S. 128 (2007) ............................................................................................... 12

*United States v. Eurodif S.A.*,
555 U.S. 305 (2009) ............................................................................................... 21

*United States v. Lopez*,
514 U.S. 549 (1995) ............................................................................................... 39

*United States v. Riverside Bayview Homes*,
474 U.S. 121 (1985) ............................................................................................... 39

*Washington State Department of Social & Health Services* v. *Keffeler*,
537 U.S. 371 (2003) ............................................................................................... 23

*West Virginia Highlands Conservancy, Inc. v. Huffman*,
625 F.3d 159 (4th Cir. 2010) ................................................................................. 42

## Statutes

5 U.S.C. § 706(2)(A) ....................................................................................................... 7

33 U.S.C. §§ 1251 ................................................................................................................ 3

33 U.S.C. § 1251(d) ............................................................................................................ 5

33 U.S.C. § 1288 ................................................................................................................ 45

33 U.S.C. § 1288(b)(2) ....................................................................................................... 45

33 U.S.C. § 1311 ................................................................................... 4, 41, 44, 46

33 U.S.C. § 1311(a) ....................................................................................................... 3, 41

33 U.S.C. § 1312 ............................................................................................................ 4, 46

33 U.S.C. § 1313 ............................................................................................................ 4, 46

33 U.S.C. § 1314(h) ............................................................................................................. 6

33 U.S.C. § 1316 ................................................................................................... 4, 44, 46

33 U.S.C. § 1317 ............................................................................................................ 4, 46

33 U.S.C. § 1323(a) ........................................................................................................... 46

33 U.S.C. § 1341 ....................................................................................... 1, 15, 26, 43

33 U.S.C. § 1341(a) ................................................................................ 10, 15, 22, 27, 36

33 U.S.C. § 1341(a)(1) .............................................................................................. passim

33 U.S.C. § 1341(d) ............................................................................... 5, 10, 21, 25

33 U.S.C. §§ 1342 .............................................................................................................. 37

33 U.S.C. § 1342(a) ........................................................................................................... 42

33 U.S.C. § 1344 .......................................................................................................... 37, 42

33 U.S.C. § 1361(a) ....................................................................................................... 5, 28

33 U.S.C. § 1362(12) ................................................................................................... 37, 43

33 U.S.C. § 1362(12)(A) .................................................................................................... 42

33 U.S.C. § 1362(14) ..................................................................................................... 4, 40

Pub. L. No. 91-224............................................................................................... 5, 11

## Code of Federal Regulations

40 C.F.R. pt. 121 ..................................................................................................... 6

40 C.F.R. § 121.1 ................................................................................................... 28

40 C.F.R. § 121.1(f) ....................................................................................... 4, 22, 37

40 C.F.R. § 121.1(n) ............................................................................................. 22

40 C.F.R. § 121.3 ................................................................................................... 9

40 C.F.R. § 121.4 ................................................................................................. 30

40 C.F.R. § 121.5(b)(9) ......................................................................................... 28

40 C.F.R. § 121.5(c)(7) ......................................................................................... 28

40 C.F.R. § 121.6 ..................................................................................... 26, 28, 31

40 C.F.R. 121.7(d) .......................................................................................... 32, 35

40 C.F.R. 121.7(e) .......................................................................................... 32, 35

40 C.F.R. § 121.9(a)-(b) ....................................................................................... 32

40 C.F.R. § 121.10(a) ........................................................................................... 36

40 C.F.R. § 124.53(e) ........................................................................................... 34

40 C.F.R. pt. 131 ................................................................................................... 4

## Federal Register

36 Fed. Reg. 22,369 (Nov. 25, 1971)....................................................................... 6

84 Fed. Reg. 15,495 (Apr. 10, 2019) ....................................................................... 6

84 Fed. Reg. 44,080 (Aug. 22, 2019)..................................................................... 2, 6

85 Fed. Reg. 42,210 (July 13, 2020) ...................................................................... passim

## U.S. Code Congressional & Administrative News

1972 U.S.C.C.A.N. 3668 ................................................................................................ 15

1972 U.S.C.C.A.N. 3735 ................................................................................................ 24

## Other

Executive Order 13,868 ................................................................................................ 6

## Federal Rules

Fed. R. Civ. P. 56(a) ............................................................................................... 8, 24

## I.    INTRODUCTION

The rule at issue in this case (the "Certification Rule" or the "Rule") provides long-overdue clarification of the important yet limited authority of *states* under the Clean Water Act ("CWA" or the "Act") to participate in the issuance of *federal* permits and licenses—including for important federal actions like permits to discharge dredge or fill material into waters of the United States, permits to construct or modify bridges across navigable waters, and hydropower licenses. More than a half-century ago, Congress specified in section 401 of the Act, 33 U.S.C. § 1341, that states and authorized tribes ("certifying authorities") should have the opportunity to provide timely review to ensure discharges resulting from such federal permits comply with federal and state water quality requirements. However, in the absence of clear guidance, state and tribal implementation of this discrete statutory requirement has frequently ranged far beyond the water quality impacts of the discharges at issue, resulting in unnecessary administrative process and overbroad permit conditions. Substantial delays have improperly stalled important infrastructure, energy, and even environmental projects from moving forward.

For example, the relicensing of the Klamath River hydroelectric project dragged on for many years because California treated repeatedly "withdrawn" and "resubmitted" requests for water quality certifications as new submissions that reset the clock for the State to make a decision. *See Hoopa Valley Tribe v. FERC*, 913 F.3d 1099, 1103-05 (D.C. Cir. 2019). As one stakeholder explained, the Klamath River project is a "concrete example of how the § 401 certification process was being manipulated by a state certification agency to delay implementation of effective water quality controls and enhancement measures," and "allowing the § 401 certification process to be used to achieve further delays in the re-licensing process is in turn an abuse of the certification process." *Final Rule*, 85 Fed. Reg. 42,210, 42,261 (July 13, 2020). Likewise, certifying authorities

have improperly extended the certification process beyond the statutorily limited time for

consideration of certification requests by requesting multi-year environmental investigations and

studies. *Id*. at 42,265. In the course of relicensing the Conowingo Dam and hydroelectric facility,

Maryland requested a multi-year environmental study, so the proponent repeatedly withdrew and

resubmitted the water quality certification request. 84 Fed. Reg. at 44,114. Certifications have been

denied for reasons unrelated to water quality. For example, New York denied certification of the

Valley Lateral Project because "FERC failed to consider or quantify the effects of downstream

[greenhouse gas emissions] in its environmental review of the Project." 85 Fed. Reg. at 42,256 n.57;

AR0000480. The challenged Rule addresses such abuses of the section 401 certification process by

clarifying the appropriate process for and scope of CWA certifications, while still assuring that

certifying authorities retain their important role in providing timely reviews regarding the water

quality impacts of proposed discharges, as Congress intended.

 Plaintiffs seek judicial review of the Certification Rule under the Administrative Procedure

Act ("APA"). They allege that the Rule exceeds the statutory authority of the Environmental

Protection Agency ("EPA") and is arbitrary and capricious or unsupported by the record. But those

claims are meritless. The Court should grant summary judgment for EPA because the Certification

Rule is within EPA's statutory authority, consistent with the Clean Water Act, reasonable, and well-

supported by the administrative record.

## II. BACKGROUND

### A. Statutory Background

Congress enacted the CWA, 33 U.S.C. §§ 1251 et seq., with the objective "to restore and

maintain the chemical, physical, and biological integrity of the Nation's waters," *id.* § 1251(a), while

declaring its policy to "recognize, preserve, and protect the primary responsibilities and rights of

States to prevent, reduce, and eliminate pollution," *id.* § 1251(b). The Act prohibits "the discharge of

any pollutant by any person," *id.* § 1311(a), except in compliance with the Act, to a subset of the

nation's waters identified as "navigable waters," which "means the waters of the United States." *Id.*

§ 1362(7).

Section 401 of the Act falls within "Title IV—Permits and Licenses" and is entitled

"Certification." It requires that:

> Any applicant for a Federal license or permit to conduct any activity including, but not
> limited to, the construction or operation of facilities, which may result in any discharge into
> the navigable waters, shall provide the licensing or permitting agency a certification from the
> State in which the discharge originates or will originate, or, if appropriate, from the interstate
> water pollution control agency having jurisdiction over the navigable waters at the point
> where the discharge originates or will originate, that any such discharge will comply with the
> applicable provisions of sections [301, 302, 303, 306, and 307] of this [Act].

33 U.S.C. § 1341(a)(1). The certification is commonly referred to as a "section 401 water quality

certification."

The CWA sections enumerated in the foregoing text all focus on regulating "point source"

discharges[1] to waters of the United States: section 301 (33 U.S.C. § 1311) prohibits the discharge of

any pollutant except in compliance with the Act; section 302 (*id*. § 1312) establishes effluent

limitations on point source discharges; section 303 (*id*. § 1313) requires the establishment of water

quality standards;[2] section 306 (*id*. § 1316) sets national performance standards for the control of

---

[1] The Act defines "point source" as "any discernable, confined and discrete conveyance" from which
pollutants are or may be discharged. 33 U.S.C. § 1362(14). As discussed in detail below, the
Certification Rule defines "discharge" for purposes of section 401 as "a discharge from a point
source into a water of the United States." 40 C.F.R. § 121.1(f).

[2] State water quality standards must be approved by EPA. 33 U.S.C. § 1313; 40 C.F.R. pt. 131.
CWA section 303 requires states to adopt water quality standards, which are considered as "other
limitations." *PUD No. 1 of Jefferson County v. Washington Department of Ecology*, 511 U.S. 700,
712-13 (1994). "Although § 303 is not one of the statutory provisions listed in § 401(d), the statute
allows States to impose limitations to ensure compliance with § 301 of the Act, 33 U.S.C. § 1311."
*Id.* at 713. Thus, section 301 incorporates section 303 by reference. *Id*.

discharges; and section 307 (*id*. § 1317) sets toxic pretreatment effluent standards. *See* 85 Fed. Reg. at 42,253.

Upon a request from a prospective federal permittee or licensee, under section 401, a certifying authority may grant, grant with conditions, deny, or waive certification. Certifying authorities may add to a certification "any effluent limitations and other limitations, and monitoring requirements" necessary to assure compliance. 33 U.S.C. § 1341(d). These additional provisions become conditions of the federal license or permit should the federal agency issue it. *Id.* A certifying authority may deny certification if it determines that the discharge from the proposed activity will not comply with the applicable sections of the CWA and appropriate requirements of state law. *Id.* § 1341(a)(1). If a certifying authority denies certification, the federal license or permit shall not issue. *Id.* A certifying authority may waive certification by "fail[ing] or refus[ing] to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request." *Id.*

Section 501 of the CWA gives the EPA Administrator the authority to adopt rules "as are necessary to carry out his functions under this chapter." 33 U.S.C. § 1361(a). Section 101(d) of the CWA expressly provides that the Administrator shall administer the CWA. 33 U.S.C. § 1251(d). Section 401 of the CWA includes responsibilities for the Administrator to issue certifications when a State or interstate agency has no authority to issue a certification under section 401(a)(1); to provide notice to other States where appropriate under section 401(a)(2); and to provide technical assistance upon request under section 401(b). Section 304(h) of the CWA also specifically directs EPA to "promulgate guidelines establishing test procedures for the analysis of pollutants that shall include the factors which must be provided in any certification pursuant to section [401 of this Act]." 33 U.S.C. § 1314(h) (setting an April 1973 deadline for doing so).

### B.    Regulatory Background

EPA issued its previous regulations relating to water quality certifications in 1971, pursuant

to section 21(b) of the Federal Water Pollution Control Act of 1948, as amended, Pub. L. No. 91-

224, 84 Stat. 91, 108-10 (1970). 36 Fed. Reg. at 22,369, 22,487 (Nov. 25, 1971) (subsequently

codified at 40 C.F.R. pt. 121); *see also* 85 Fed. Reg. at 42,211. Prior to the Certification Rule, EPA's

regulations did not reflect the 1972 amendments to the 1970 Federal Water Pollution Control Act,

which created section 401, despite the fact that the 1972 amendments made changes to the relevant

statutory text. 85 Fed. Reg. at 42,211. On April 10, 2019, the President signed Executive Order

13,868, Promoting Energy Infrastructure and Economic Growth, which required EPA to engage with

states, tribes, and federal agencies to update the Agency's outdated guidance and regulations,

including the 1971 regulatory certification framework. 84 Fed. Reg. 15,495. As a result of this

process, EPA issued a proposed rule on August 8, 2019 and sought public comment. *Proposed Rule*,

84 Fed. Reg. 44,080 (Aug. 22, 2019). After making certain key modifications, EPA issued the

Certification Rule, which became effective on September 11, 2020. 85 Fed. Reg. at 42,210.

## III.    STANDARD OF REVIEW

### A.    The Administrative Procedure Act

Judicial review under the APA is "narrow." *Motor Vehicle Manufacturers Ass'n v. State*

*Farm Mutual Auto Insurance Co.*, 463 U.S. 29, 43 (1983); *Hughes River Watershed Conservancy v.*

*Johnson*, 165 F.3d 283, 287-88 (4th Cir. 1999). The Certification Rule must be upheld unless it is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §

706(2)(A). Under this standard, a court may not substitute its judgment for that of the agency. *Motor*

*Vehicle Manufacturers Ass'n*, 463 U.S. at 43. "[S]o long as the agency 'provide[s] an explanation of

its decision that includes a rational connection between the facts found and the choice made,' its

decision should be sustained." *American Whitewater v. Tidwell*, 770 F.3d 1108, 1115 (4th Cir. 2014)

(citations omitted). Even an agency decision "of less than ideal clarity" may be upheld by the court "if the agency's path may reasonably be discerned." *Motor Vehicle Manufacturers Ass'n*, 463 U.S. at 43.

### B.    Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Rule 56(a) standard applies differently for an APA claim. *Solis v. Cissna*, No. CV 9:18-00083-MBS, 2019 WL 8219790, at *4 (D.S.C. July 11, 2019). In an APA claim, "summary judgment becomes the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Ohio Valley Environmental Coalition v. Hurst*, 604 F. Supp. 2d 860, 879 (S.D. W. Va. 2009) (internal quotation omitted); *accord Spartanburg General Hospital v. Heckler*, 607 F. Supp. 635, 640 n.6 (D.S.C. 1985). Therefore, in a record review case, the plaintiff has the burden of persuasion and must demonstrate that defendants' actions were arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law. *Defenders of Wildlife v. North Carolina Department of Transportation*, 762 F.3d 374, 393 (4th Cir. 2014).

## IV.    ARGUMENT

The Certification Rule reflects EPA's reasonable, holistic interpretation of CWA section 401. Plaintiffs cannot meet their burden of demonstrating otherwise. As we establish in Part A below, EPA properly exercised its rulemaking authority to resolve an ambiguity in section 401 that certifying authorities had improperly used to regulate activities that are beyond the scope of the CWA. In Part B, we show that EPA also acted reasonably and within its authority by clarifying that, through the section 401 process, certifying authorities may only impose conditions that are related to water quality. Next, in Part C, we demonstrate that the Certification Rule appropriately establishes

an objective trigger for the start of the statutory "reasonable period of time . . . not exceed[ing] one year" by specifying what constitutes a certification request. In Part D, we refute Plaintiffs' claim that the Rule improperly provides for federal agency review of certification conditions. And finally, in Part E, we explain how the Certification Rule reasonably interprets section 401 to exclude nonpoint source discharges from the certification process. In sum, the Certification Rule is fully consistent with the statute and applicable case law and is well-supported by the administrative record. Accordingly, the Court should grant EPA's motion for summary judgment and dismiss the case.

### A. EPA's Definition of the "Scope of Certification" Is Reasonable and Consistent with the Clean Water Act.

The Certification Rule provides that "[t]he scope of a Clean Water Act section 401 certification is limited to assuring that a discharge from a federally licensed or permitted activity will comply with water quality requirements." 40 C.F.R. § 121.3. Where, as here, a challenged rule contains an agency interpretation of statutory language, this Court reviews the interpretation under *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984) ("*Chevron*"). In *Chevron* Step One, this Court must determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842-43. "[I]f the statute is silent or ambiguous with respect to the specific issue," the Court proceeds to Step Two to determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. The Certification Rule should be upheld because it reflects a reasonable interpretation of the scope of certification under CWA section 401.

### 1. The Scope of Section 401 Certification Is Ambiguous, and EPA's Interpretation Is Reasonable and Entitled to Deference.

EPA has broad authority to interpret the statutes it implements. *See Chevron*, 467 U.S. at 843-44. Applying *Chevron* Step One here, EPA reasonably concluded that the language of section 401 is ambiguous regarding the scope of certification. Section 401(a) provides that the certifying authority, described as "the State in which the *discharge* originates or will originate," must certify

that "any such *discharge* will comply with the applicable provisions" of the CWA. 33 U.S.C. § 1341(a) (emphasis added). The text of section 401(a) therefore directs authorities to certify that the *discharge* resulting from the proposed federally licensed project will comply with the CWA. Section 401(d), which addresses certification conditions, uses different language and requires the certifying authority to "set forth any effluent limitations . . . necessary to assure that any *applicant* for a Federal license or permit will comply with any applicable" requirements. 33 U.S.C. § 1341(d) (emphasis added). The use of the term "applicant" in section 401(d)—instead of "discharge" as found in section 401(a)—creates ambiguity because it renders the scope of certification under section 401 subject to more than one reasonable interpretation. As EPA explained in the Certification Rule, *see* 85 Fed. Reg. at 42,232-33, one could reasonably construe "applicant" as a mere reference to the party applying for the permit and conclude that section 401(a) limits the scope of certification to "discharges," rather than all activities associated with a project. Alternatively, one could conclude, as the Supreme Court did in 1994, that section 401 is "reasonably read as authorizing additional conditions and limitations on the activity as a whole once the threshold condition, the existence of a discharge, is satisfied." *PUD No. 1 of Jefferson County v. Washington Department of Ecology*, 511 U.S. 700, 711-12 (1994) ("*PUD No. 1*"). Because both interpretations are plausible, EPA's interpretation "governs," even if it is not "the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (emphasis in original).

The question at *Chevron* Step Two is "whether the agency's answer [to the interpretive question] is based on a permissible construction of the statute." *Mayo Foundation for Medical Education & Research v. United States*, 562 U.S. 44, 54 (2011) (quoting *Chevron*, 467 U.S. at 843). Interpreting ambiguous language "involves difficult policy choices," so judicial deference is critical,

as "agencies are better equipped to make [such choices] than courts." *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 982 (2005) ("*Brand X*").

Here, the Agency's interpretation of the scope of certification under section 401 is reasonable and well-supported. EPA extensively considered possible interpretations of, and responded to comments regarding, the scope of certification under section 401. *See, e.g.*, 85 Fed. Reg. at 42,232-33; 42,251-53. Throughout that process, EPA drafted the Certification Rule to reconcile section 401(a) and (d) by giving meaning to both "discharge" and "applicant." Instead of interpreting a single word ("applicant") in section 401(d) to unilaterally expand the scope of certification such that it covers entire projects, section 401 "must be read as a whole." *United States v. Atlantic Research Corp.*, 551 U.S. 128, 135 (2007) (internal quotation marks omitted). A contrary reading would entirely fail to give meaning to Congress's limitation of section 401(a) to "discharge[s]"—thus violating the rule against surplusage. *See Bennett v. Spear*, 520 U.S. 154, 173 (1997) ("It is the cardinal principle of statutory construction that it is our duty to give effect, if possible, to every clause and word of a statute . . . .") (alterations and internal quotation marks omitted). EPA's reading recognizes that the term "applicant" in section 401(d) merely identifies the person or entity responsible for obtaining and complying with the certification and any associated conditions, rather than expanding the regulatory scope of that section. *See* 85 Fed. Reg. at 42,232-33. This interpretation of the term "applicant" appropriately ties the term to the discharges that are the regulatory focus of section 401 as a whole. *See id.* at 42,232. In other words, the phrase "applicant for a Federal license or permit" in section 401(d) simply refers back to the applicability of section 401(a) to an "applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters." 33 U.S.C. § 1341(a)(1). By giving meaning to the terms of both 401(a) and (d), EPA has crafted a reasonable interpretation of the scope of certification.

EPA's interpretation is also reasonable given the context and purpose of section 401 and the broader statute. Congress enacted the CWA to promote water quality through a framework of cooperative federalism. *See Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992). Section 401 allows states, tribes, and federal permitting agencies to work in concert to ensure that appropriate conditions are in place before an entity may discharge into navigable waters. The Certification Rule thus promotes the purposes of the Act and of section 401 by appropriately balancing state and federal authority and responsibility in regulating discharges.

Conversely, relying on the presence of the term "applicant" in section 401(d) to allow certification conditions that are unrelated to a discharge would expand section 401 regulatory authority beyond the scope of those sections of the Act enumerated in section 401: section 301 (prohibiting the discharge of any pollutant except in compliance with the Act); section 302 (establishing effluent limitations on point source discharges); section 303 (requiring the establishment of water quality standards); section 306 (setting national performance standards for the control of discharges); and section 307 (setting toxic pretreatment effluent standards). *See* 85 Fed. Reg. at 42,253. These CWA provisions all focus on regulating discharges to waters of the United States.[3] EPA's interpretation thus recognizes that Congress specifically crafted section 401 to allow limited state and tribal involvement in the federal regulation of specific discharges, not to expand that involvement to distort the federal permitting scheme of which it is a part. *See, e.g., Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 356 (4th Cir. 2006) (cautioning against a

---

[3] The Certification Rule definition of "water quality requirements" includes those enumerated provisions of the CWA and state or tribal regulatory requirements that pertain specifically to point source discharges into waters of the United States. With one exception, each of the enumerated CWA provisions in section 401 describes discharge-related limitations. The only exception is section 303, which addresses water quality standards, but these are primarily used to establish numeric limits in point source discharge permits. *See* 85 Fed. Reg. at 42,253.

reading of a statute that would "permit an exception . . . to swallow the rule and undermine the regulatory balance that Congress established"). EPA's conclusion that certification review applies to specific discharges, rather than entire projects, is reasonable in the context of section 401 and advances the purposes of the CWA as a whole.

Finally, the legislative history of the 1972 CWA amendments confirms that EPA's interpretation is reasonable. Congress created the 1972 CWA by amending what was functionally a different statute, the 1970 Federal Water Pollution Control Act. The equivalent to section 401(a) in the preexisting 1970 statute required certification that an "activity" would comply with applicable water quality standards. *See* Pub. L. No. 91-224, 84 Stat. at 108 (requiring, in section 21(b)(1), that a state certify that "such *activity* will be conducted in a manner which will not violate applicable water quality standards" (emphasis added)). When Congress enacted the 1972 amendments, it chose not to carry forward the term "activity." Instead, it altered the text to require certification that a "discharge" would comply with applicable standards. 33 U.S.C. § 1341(a). Under basic canons of statutory construction, this Court must presume that Congress chose its words intentionally. *See, e.g., Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."). EPA's interpretation of section 401 reflects Congress's deliberate choice to narrow the scope of certification from the "activity" in the 1970 statute to the "discharge" in the 1972 CWA amendments.

The use of the term "applicant" in section 401(d) is consistent with this interpretation. Had Congress intended to use section 401(d) to expand the scope of certification, it could have carried forward "activity" from the 1970 statute into section 401(d). Instead, Congress specified merely that the certifying authority may impose conditions necessary to ensure that the "applicant" complies with relevant requirements—tying section 401(d) back to section 401(a)'s requirement of

11

certification for an "applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters." 33 U.S.C. § 1341. This understanding comports with that of members of Congress during the drafting process addressing section 401. *See, e.g.*, S. Rep. No. 92–414, at 69 (1971), reprinted in 1972 U.S.C.C.A.N. 3668, 3735 ("This section is . . . amended to assure consistency with the bill's changed emphasis from water quality standards to effluent limitations based on the elimination of any discharge of pollutants." (parentheticals omitted)); 117 Cong. Rec. 38,797, 38,855 (1971) (Mr. Muskie: "Sections 401 and 402 provide for controls over discharge."). EPA's interpretation is therefore reasonable under the text of section 401, the statutory framework of the CWA, and the legislative history of the 1972 amendments.

### 2.     EPA's Interpretation of the Scope of Certification under Section 401 Is Permissible under the Supreme Court's Decision in *PUD No. 1.*

Plaintiffs argue that the Supreme Court has held that the CWA unambiguously directs a certifying state to consider the impacts of a proposed activity as a whole, rather than specific discharges. Compl. ¶ 163 (citing *PUD No. 1*, 511 U.S. at 711). That assertion is incorrect and rests on a misreading of the Supreme Court's decision in *PUD No. 1*. Instead, EPA retains the right to reasonably construe the language of section 401. That is because a "court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference *only if* the prior court decision holds that its construction follows from the *unambiguous* terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982 (emphasis added). In *PUD No. 1*, the Supreme Court did not hold that section 401 is unambiguous regarding the scope of certification.

At issue in *PUD No. 1* was whether a state exceeded its authority under section 401. *See PUD No. 1*, 511 U.S. 700. The principal dispute was whether a certifying authority may require a minimum stream flow as a condition of certification. *See id.* at 710. The project proponent identified

two potential discharges from its proposed hydroelectric facility: "the release of dredged and fill material during construction of the project, and the discharge of water at the end of the tailrace after the water has been used to generate electricity." *Id.* at 711. The project proponent argued that the minimum stream flow condition was unrelated to these discharges and therefore beyond the scope of the State's authority. *See id.*

The Supreme Court determined that the State could impose minimum stream flow conditions as part of its section 401 certification. In reaching this conclusion, the Court analyzed the use of different terms in sections 401(a) and 401(d) to inform the scope of a section 401 certification. The Supreme Court recognized the tension between the use of "discharge" in section 401(a) and "applicant" in 401(d), finding that the challenger's argument would have carried "considerable force" under 401(a) alone. *Id*. However, the Court ultimately sided with the State, concluding that "§ 401(d) is *most reasonably read* as authorizing additional conditions and limitations on the activity as a whole once the threshold condition, the existence of a discharge, is satisfied." *Id.* at 711-12 (emphasis added).

The fact that the Supreme Court held a broader interpretation of the section 401 scope of certification "reasonable," however, does not foreclose EPA's interpretation. As explained above, "[o]nly a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction." *Brand X*, 545 U.S. at 982-83. In other words, a court's interpretation of statutory language under *Chevron* Step One is binding on subsequent agency action, but a court's determination that an interpretation is reasonable under *Chevron* Step Two leaves the agency free to adopt a different reasonable interpretation at a later point. Because *PUD No. 1* did not hold that Section 401 is unambiguous, EPA is free to interpret section 401's language regarding the scope of

13

certification, so long as its interpretation is reasonable. And EPA's interpretation is indeed reasonable for the reasons discussed above and below. *See also, e.g.*, 85 Fed. Reg. at 42,221-22, 42,233-34, 42,251-52 (thoroughly considering the Supreme Court's decision in *PUD No. 1* and responding to comments regarding the same).

The Supreme Court in *PUD No. 1* did not analyze section 401 at *Chevron* Step One or rely on the "unambiguous terms" of the CWA to support its reading of section 401. *See Brand X*, 545 U.S. at 982. Instead, the Court "reasonably read" section 401(d) as authorizing conditions related to the activity as a whole. *PUD No. 1*, 511 U.S. at 712. After analyzing the text of sections 401(a) and (d), the Supreme Court concluded that "EPA's conclusion that activities—not merely discharges— must comply with state water quality standards is a reasonable interpretation of § 401 and is entitled to deference," *id.*, an unmistakable signal that the Court was deciding the matter under *Chevron*'s second step.

Further, given the circumstances of *PUD No. 1*, that decision is best read as a *Chevron* Step Two, not a Step One, analysis. First, neither EPA nor any other federal agency was a party to the case. The United States filed an amicus brief but did not analyze or present EPA's interpretation of the different language in sections 401(a) and (d), nor did it even argue for *Chevron* deference. *See* 85 Fed. Reg. at 42,233-34. The amicus brief instead argued that it was unnecessary to harmonize the two provisions to resolve the dispute presented in *PUD No. 1*. *See id*.

Second, the Supreme Court did not have before it any EPA regulations directly interpreting sections 401(a) and (d). *See* 85 Fed. Reg. at 42,232-33. Rather, the Court appears to have gleaned "EPA's conclusion" from the regulations issued by EPA in 1971, which did not address the 1972 CWA amendments. The 1971 regulations predated the 1972 amendments and therefore did not reflect Congress's deliberate narrowing of the scope of section 401 from "activity"-wide to

14

"discharge"-specific. In light of these circumstances, there was no reason for the Supreme Court to disrupt the "presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Brand X*, 545 U.S. at 982 (internal quotation marks omitted).

Plaintiffs may cherry-pick parts of the Supreme Court's textual analysis of section 401 to argue that the Court decided *PUD No. 1* at *Chevron* Step 1. *See id.* at 711 ("Section 401(d) thus allows the State to impose 'other limitations' on the project in general . . ."). But a reading of the full analysis makes clear that the Court did no such thing. The Court's expansive reading of 401(d) immediately followed its acknowledgement that 401(a) suggested a scope of certification restricted to discharges from the proposed project; the Court offered both potential interpretations in the context of recognizing the apparent tension between the two subsections. The Supreme Court's analysis of section 401(d) does not mean the statute unambiguously requires a project-wide scope of certification, any more than the Court's recognition that 401(a) "refers to a state certification that a 'discharge' will comply with certain provisions of the Act" means the statute unambiguously requires a discharge-specific scope of certification. Both statements were made as part of the analysis that concluded in the Supreme Court's finding a broader scope of certification reasonable under the statute. Nothing in the *PUD No. 1* decision indicates that the Supreme Court believed the language of section 401 unambiguously required that interpretation and foreclosed all others. Because the Supreme Court did not hold that the statute is unambiguous under *Chevron* Step One, EPA remains free to reasonably interpret its language. *See United States v. Eurodif S.A.*, 555 U.S. 305, 315 (2009) ("a court's choice of one reasonable reading of an ambiguous statute does not preclude an implementing agency from later adopting a different reasonable interpretation").

Because the Certification Rule reasonably interprets the scope of certification established in section 401, Defendants are entitled to summary judgment in their favor on this issue.

**B.      The Certification Rule Reasonably Provides for Certifying Authorities to Place Conditions on Certifications Related to "Water Quality Requirements."**

Section 401 provides a specific and defined scope for certifying authorities to protect water quality in the context of a federal licensing or permitting process, consistent with the overall cooperative federalism construct established by the CWA. *See Arkansas*, 503 U.S. at 101 ("The Clean Water Act anticipates a partnership between the States and the Federal Government."). When a certifying authority grants a certification, that certification "shall set forth" limitations "necessary to assure that any applicant for a Federal license or permit" will comply with enumerated requirements of the CWA "or any other appropriate requirement of State law." 33 U.S.C. § 1341(d). The Certification Rule uses the term "water quality requirements" to define the universe of federal or state law provisions that certifying authorities may consider under section 401. EPA's holistic interpretation that harmonizes sections 401(a) and 401(d) leads to the related conclusion that "other appropriate" requirements of state law must address the protection of water quality from point source discharges into waters of the United States,[4] including provisions more stringent than federal law. Because the text, structure, history and purpose of section 401 support the interpretation that "other appropriate requirements of State law" is a subset of "water quality requirements," EPA's reading of the statute is entitled to deference. *See Chevron*, 467 U.S. at 843-44.

---

[4] The Certification Rule defines "discharge" as "a discharge from a point source into a water of the United States." 40 C.F.R. § 121.1(f). Consistent with the definition, "water quality requirements" means "applicable provisions of §§ 301, 302, 303, 306, and 307 of the Clean Water Act, and state or tribal regulatory requirements for point source discharges into waters of the United States." 40 C.F.R. § 121.1(n). EPA's interpretation of the scope of section 401 as limited to point source discharges is discussed below (Section IV.E).

The text and structure of section 401 show that Congress intended certifications to ensure compliance with "water quality requirements" only. Congress' choice to reference specific CWA water quality requirements multiple times in 401(a) and (d) underscores the focused intent of this provision on the protection of water quality from point source discharges. *See* 33 U.S.C. §§ 1341(a), (d). When a certifying authority issues a certification for a proposed federally licensed or permitted activity under section 401, it determines compliance with applicable effluent limitations for new and existing sources (CWA sections 301, 302, and 306), water quality standards and implementation plans (section 303), toxic pretreatment effluent standards (section 307), and—by way of its power to add conditions pursuant to section 401(d)—"other appropriate requirements of State law." *Id.* The general term "appropriate requirements" in section 401(d) appears only after Congress enumerated four CWA provisions that all focus on ensuring that point source discharges of pollutants do not degrade water quality. Where general words follow an enumeration of two or more specific items, they apply only to things of the same general kind or class specifically mentioned. *See Washington State Department of Social & Health Services* v. *Keffeler,* 537 U.S. 371, 383-85 (2003); *Cleveland v. United States,* 329 U.S. 14, 18 (1946) ("Under the *ejusdem generis* rule of construction the general words are confined to the class and may not be used to enlarge it"). Thus, "other appropriate requirements" is most reasonably interpreted as a subset of "water quality requirements." *See* 85 Fed. Reg. at 42,230-31.

Read in context, section 401 is not an "unbounded" avenue for certifying authorities to impose conditions on federal projects unrelated to water quality. *See PUD No. 1*, 511 U.S. at 712. In *American Rivers v. FERC*, 129 F.3d 99 (2d Cir. 1997), the Second Circuit found it "plainly true" that "Section 401 authorizes states to impose only conditions that relate to water quality." *Id.* at 107. The Second Circuit continued*,* "Section 401(d), reasonably read in light of its purpose, restricts

conditions that states can impose to those affecting water quality in one manner or another." *Id.* (citing *PUD No. 1*, 511 U.S. at 711-13). Nothing in the text of the statute or its legislative history signals that Congress intended to impose, using section 401, requirements on licensed or permitted activities beyond those addressing water quality. Plaintiffs contend that "other appropriate requirements of State Law" throws open the door to a broad scope of state laws that may be conditions for a water quality certification. Compl. ¶¶ 170-72. But this interpretation essentially substitutes "appropriate" with "any" and violates the rule against surplusage. *See, e.g.*, *Colautti v. Franklin*, 439 U.S. 379, 392 (1979) ("Appellants' argument . . . would make either the first or the second condition redundant or largely superfluous, in violation of the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.")

The legislative history of the Act provides further support for EPA's interpretation, as it frequently notes that the focus of section 401 is on assuring compliance with water quality requirements and water quality standards and on eliminating any discharges of pollutants. *See, e.g.*, S. Rep. No. 92-414, at 69 (1971), reprinted in 1972 U.S.C.C.A.N. 3735 (section 401 "makes clear that any water quality requirements established under State law, more stringent than those requirements established under the Act, shall through certification become conditions on any Federal license or permit"). Congress's focus on the states' role in protecting water quality standards through section 401 was highlighted by the Supreme Court, which quoted Senator Muskie's floor statement during section 401's enactment:

> No polluter will be able to hide behind a Federal license or permit as an excuse for a violation of *water quality standard[s]*. No polluter will be able to make major investments in facilities under a Federal license or permit without providing assurance that the facility will comply with *water quality standards*. No State water pollution control agency will be confronted with a fait accompli by an industry that has built a plant without consideration of *water quality requirements*.

*S.D. Warren Co. v. Maine Board of Environmental Protection*, 547 U.S. 370 (2006) (emphasis added). The Court then stated: "These are the very reasons that Congress provided the States with power to enforce 'any other appropriate requirement of State law,' 33 U.S.C. § 1341(d), by imposing conditions on federal licenses for activities that may result in a discharge." *Id.* The text, structure and legislative history of section 401 support the Certification Rule's focus on water quality requirements. *See* 85 Fed. Reg. at 42,230-31. Thus, even if there is ambiguity in the statute, EPA's interpretation of the phrase "other appropriate requirements of State law" as limited to water quality requirements is reasonable, consistent with the text, structure, history and purpose of section 401, and entitled to deference. *See Chevron*, 467 U.S. at 843-44.

### C.    The Certification Rule Reasonably Clarifies when the "Reasonable Period of Time" Begins.

The Certification Rule provides needed clarity and regulatory certainty regarding the timing for action on a certification request. The Rule clarifies that the federal agency sets the "reasonable period of time" for action on a request and provides a uniform standard governing when that time starts to run. 40 C.F.R. § 121.6. Section 401 provides that a certifying authority must act on a section 401 certification request "within a reasonable period of time (which shall not exceed one year)." 33 U.S.C. § 1341(a)(1); *see also Hoopa Valley Tribe,* 913 F.3d at 1103; *American Rivers, Inc.,* 129 F.3d at 107. Section 401 does not guarantee a state or tribe a full year to act on a certification request, as the statute only grants as much time as is "reasonable." 33 U.S.C. § 1341(a)(1); 85 Fed. Reg. at 42,235. Congress included the one-year maximum to "insure that sheer inactivity by the [certifying authority] will not frustrate the Federal application." H.R. Rep. No. 92-911, at 122 (1972), reprinted in *Legislative History of the Federal Water Pollution Control Act of 1972 ("Legis. Hist.")* (Comm. Print 1972). The timeline for action on a section 401 certification begins "after receipt" of a certification request. 33 U.S.C. § 1341; *New York State Department of Environmental Conservation*

*v. FERC*, 884 F.3d 450, 455-56 (2d Cir. 2018). If a certifying authority does not act (either grant, grant with conditions, deny, or expressly waive the section 401 certification) within a reasonable time period, section 401 states that "the certification requirements of this subsection shall be waived with respect to such Federal application." 33 U.S.C. § 1341(a).

The plain language of the Act requires that the "reasonable period" not extend beyond one year "after receipt of" the certification request. 33 U.S.C. § 1341(a). In *New York State Department of Environmental Conservation*, the Second Circuit held that the "plain language of Section 401 outlines a bright-line rule regarding the beginning of review," 884 F.3d at 455, and that the statutory clock is triggered not when a state determines that a request for certification is "complete" but rather after "receipt of such request" by the certifying authority, 33 U.S.C. § 1341(a)(1). Consistent with this plain language reading, the Certification Rule defines "certification request" and "receipt" to resolve uncertainty and inefficiencies in the certification process and to prevent litigation and certification decisions that extend beyond the statutory reasonable period of time.

The Certification Rule for the first time interprets the terms "request for certification" and "receipt" as used in section 401 and clarifies the components that must be present to trigger the "reasonable period of time" for review by certifying authorities. Section 121.5(b) and (c) of the Rule list the required components of a "certification request," which include, for example, identifying the project proponent and the applicable federal permit. This consistent and objective list of the information necessary to start the "reasonable period of time" provides certainty and clarity to the certification process. *See* 85 Fed. Reg. at 42,235. EPA also encourages pre-filing meetings, engagement, and information sharing between project proponents and certifying authorities, but such engagement does not start the reasonable period of time unless a certification request, as defined in the Certification Rule, is submitted to the certifying authority. *See id.* at 42,236. To provide

additional clarity, the request must also include the following statement: *"The project proponent hereby requests that the certifying authority review and take action on this CWA 401 certification request within the applicable reasonable period of time."* 40 C.F.R. § 121.5(b)(9), (c)(7). This requirement is intended to remove any potential ambiguity on the part of the certifying authority about whether the written request before it is, in fact, a "certification request" that triggers the statutory timeline. *See* 85 Fed. Reg. at 42,235-36. The Rule also defines "receipt" as the "date that a certification request is documented as received by a certifying authority in accordance with applicable submission procedures," 40 C.F.R. § 121.1, and makes clear that "the reasonable period of time shall not exceed one year from receipt," *id.* § 121.6(a).

The Clean Water Act does not define the phrase "request for certification." It therefore falls to the Agency to reasonably interpret that phrase. *See Chevron*, 467 U.S. at 844; 33 U.S.C. § 1361(a) (authorizing EPA to adopt rules "as are necessary to carry out [its] functions under this chapter"). EPA recognizes that the lack of clear federal guidance and implementation of CWA section 401 following enactment of the 1972 CWA amendments resulted in a patchwork of state and tribal programs with different timing, request, and review requirements for water quality certifications. Similarly, recent cases indicate that some project proponents, certifying authorities, and federal agencies had different ideas about when the time for review of a certification begins. *See Hoopa Valley Tribe*, 913 F.3d 1099; *New York State Department of Environmental Conservation*, 884 F.3d 450; *Constitution Pipeline Co., LLC v. New York State Department of Environmental Conservation*, 868 F.3d 87 (2d Cir. 2017). But, EPA's delay in promulgating section 401 implementing regulations does not undercut the Agency's authority and obligation to promulgate implementing regulations for this important CWA program. By reasonably interpreting the term "request for certification" and laying out clear instructions for the information that must be included in such a request, the

Certification Rule provides needed clarity and uniformity and helps ensure that certifying authorities have sufficient notice and information to timely begin their evaluation of a certification request. Likewise, by clarifying that the "reasonable period of time" runs from the date of "receipt" of the request by the certifying authority, the Rule resolves any ambiguities over timing for section 401 certifications.

Plaintiffs argue that the Certification Rule's definition of "certification request" improperly narrows the information available to the certifying authority and will result in states making rushed certification decisions based on incomplete information. *See* Compl. ¶¶ 156-57; 181; 190-91. However, the Certification Rule does not limit the ability of a certifying authority to communicate with project proponents and request additional information necessary to take an informed action on a certification request in a reasonable period of time. The components of a certification request identified in the final rule are intended to be sufficient information to start the reasonable period of time but may not necessarily represent the totality of information a certifying authority may need to act on a certification request. *See* 85 Fed. Reg. at 42,245. At least thirty days before submitting a certification request, an applicant must request a pre-filing meeting from the certifying authority, which provides an opportunity to identify, request, and discuss additional information that may be needed. *See* 40 C.F.R. § 121.4. Under the Certification Rule, a certifying authority may request, and a project proponent may provide, additional relevant information to aid in a certification decision. *See* 85 Fed. Reg. at 42,245. If pre-filing meetings, discussions, and submittals prior to the end of the reasonable period of time fail to produce the information necessary for a certifying authority to grant certification or grant certification with conditions, certifying authorities retain the ability to deny or waive a certification request. *See* 85 Fed. Reg. at 42,246.

The definition of "certification request" in the Certification Rule represents EPA's reasonable effort to balance the desire for certifying authorities to have all necessary information as soon as possible in the certification process with the statutory requirement for timely action on a request. The final rule strikes the appropriate balance by identifying the kinds of information that provide a reasonable baseline about any project while recognizing the ability of certifying authorities and project proponents to request and provide additional information both before and after the review clock starts.[5]

EPA's clarification of the information required to submit a certification request does not infringe on state certification authority. While the Rule identifies informational requirements for certification requests, these requirements merely identify the kind of information necessary to ensure that a certification request is informative enough to initiate state review. These few procedural requirements do not dictate the state's decision-making process or require a particular outcome from that process. The definition of "certification request" within the Certification Rule is well within EPA's authority, and it will promote clarity and efficiency in the certification process.

In adopting the Certification Rule, EPA considered various methods by which certifying authorities have extended the statutory one-year limit, AR000473, and concluded that clear and transparent requirements would allow project proponents and certifying authorities to make decisions with symmetrical information and should lead to reduced ambiguity, confusion and delay.

---

[5] For these reasons, contrary to Plaintiffs' allegations, Compl. ¶ 160, EPA adequately responded to comments alleging that the definition of "certification request" was too narrow to allow states to thoroughly evaluate impacts on their waters in reaching a certification decision. EPA explained that the definition of "certification request" balances the competing need for complete information with the need for timely action on a request, *see* 85 Fed. Reg. at 42,246; that nothing in the Certification Rule prevents continued coordination between certification authorities and federal licensing and permitting agencies to ensure the certifying agency has the necessary information, *see* AR043701; and that the burden is on the project proponent to provide additional information as appropriate to facilitate the certification process, *see* AR043700.

*See* AR000486. The Certification Rule clarifies that the federal licensing and permitting agencies, who have decades of experience in processing applications in accordance with their programs, establish the "reasonable period of time." 85 Fed. Reg. at 42,259 (codified at 40 C.F.R. § 121.6). This approach is consistent with case law interpreting section 401, which has held a licensing agency "may determine whether the proper state has issued the certification or whether a state has issued a certification within the prescribed period." *American Rivers,* 129 F.3d at 110-11. EPA also considered the effects of the Certification Rule on state and tribal public notice procedures or requirements for public participation. 85 Fed. Reg. at 42,259. As EPA explained in the final rule, federal agencies and certifying authorities have in the past worked cooperatively to ensure that public participation requirements are met within the reasonable period of time. *Id*. Because EPA considered the relevant factors and reached reasonable conclusions about how to address timing concerns in the certification process, these provisions of the Certification Rule should be upheld. *See* Fed. R. Civ. P. 56(a)*, Motor Vehicle Manufacturers Ass'n*, 463 U.S. at 43; *American Whitewater*, 770 F.3d at 1115; *Defenders of Wildlife*, 762 F.3d at 393.

### D.    The Certification Rule Reasonably Requires that Federal Agencies Conduct a Procedural Review of 401 Certification Conditions to Ensure Compliance with Section 401.

EPA reasonably interprets section 401 to provide federal agencies the authority to reject certification actions that do not comply with the procedural requirements of the statute and its implementing regulations. The Certification Rule requires federal agencies to determine whether a certifying authority's certification, certification condition, or denial includes the information requirements in sections 121.7(c), 121.7(d), or 121.7(e) of the final rule, and meets "other procedural requirements of section 401." 40 C.F.R. § 121.9(a)-(b); 85 Fed. Reg. at 42,267-69; *see City of Tacoma, Washington* v. *FERC*, 460 F.3d 53, 67-68 (D.C. Cir. 2006). Section 401(a)(1) provides that no "license or permit shall be granted until the certification *required by this section* has been

obtained or has been waived." 33 U.S.C. § 1341(a)(1) (emphasis added). Sections 121.8 (Effect of denial of certification), 121.9 (Waiver), and 121.10 (Incorporation of certification conditions into the license or permit) of the Rule contemplate that the federal licensing or permitting agency will review certifications to ensure that certifying authorities have included the required elements and completed important procedural steps of a section 401 certification. This federal agency review is procedural in nature and does not require any specific expertise in or knowledge of water quality or state or tribal law. 85 Fed. Reg. at 42,267-69. Under the Certification Rule, the federal agency's review is limited to determining whether the certification action accords with procedural requirements, including whether the certification, condition, or denial includes all of the required information. *Id.*

This limited federal review is supported by case law that recognizes that federal agencies have the authority to reject certifications or conditions that are inconsistent with the procedural requirements of section 401. In *City of Tacoma,* the D.C. Circuit noted that if "the question regarding the state's section 401 certification is not the application of state water quality standards but compliance with the terms of section 401, then [the federal agency] must address it. This conclusion is evident from the plain language of section 401: 'No license or permit shall be granted until the certification *required by this section* has been obtained or has been waived.' " 460 F.3d at 67-68 (citing 33 U.S.C. §1341(a)(1)) (emphasis in original). The court explained that even though the federal agency did not need to "inquire into every nuance of the state law proceeding," the statute requires the federal agency "at least to confirm that the state has facially satisfied the express requirements of section 401." *Id.* at 68; *see also Hoopa Valley Tribe,* 913 F.3d at 1105 (noting that had "FERC properly interpreted Section 401 and found waiver when it first manifested more than a decade ago, decommissioning of the Project might very well be underway"); *Airport Communities Coalition* v. *Graves,* 280 F. Supp. 2d 1207, 1217 (W.D. Wash. 2003) (holding that federal agency

had discretion not to incorporate untimely certification conditions). This limited procedural review function is consistent with EPA's own longstanding practice under its CWA permitting regulations implementing section 401 that allow EPA to make such determinations under certain circumstances. *See* 40 C.F.R. § 124.53(e).

Section 401(a)(1) does not provide certifying authorities unbounded authority to certify, deny, or condition certification requests. The language stating that no "license or permit shall be granted if certification has been denied," must be read in the context of the statutory authority granted to certifying authorities within section 401. That provision itself says nothing about the specific information that certifying authorities must provide to the federal permitting agency to establish that the certification complies with section 401. Yet, the federal agency must determine whether section 401's requirements have been met. *City of Tacoma*, 460 F.3d at 67-68. EPA reasonably filled that statutory gap here with the Certification Rule. *See Chevron*, 467 U.S. at 843-44. For example, if certification denials do not include the three elements listed in section 121.7(e) of the Rule (specific water quality requirements with which the discharge will not comply; statement why the discharge will not comply; and description of the water quality data that would be needed to assure that the discharge will comply), or if certification conditions do not include the two elements in section 121.7(d) (statement explaining why the condition is necessary to assure that the discharge will comply with water quality requirements and citation to applicable law), then the certifying authority has "fail[ed] or refuse[d] to act" and therefore has waived certification or the deficient certification condition. 40 C.F.R. 121.7(d)- (e). The Rule's definitions of "water quality requirements," "discharge," and "certification," and the information requirements for certification conditions and denials listed in sections 121.7(d) and 121.7(e), will help ensure that certifying authorities have the information and necessary tools to act on a certification request within the scope

26

of certification as provided in the Certification Rule. When certifying authorities act within their authority and include the required information, their power is substantial: no "license or permit shall be granted" regardless of whether the federal agency may disagree with aspects of the certifying authority's substantive determination. 33 U.S.C. § 1341(a).

In the rulemaking, EPA addressed concerns that the rule as proposed might require federal agencies to be experts on state or tribal law or the water resources they protect because EPA proposed that federal agencies would undertake a substantive review. 85 Fed. Reg. at 42,269. Accordingly, the final rule does not authorize the federal agency to make a substantive inquiry into the sufficiency of the information provided in support of a certification, condition, or a denial. Rather, the final rule requires only that the federal agency confirm that the certifying authority has complied with procedural requirements of the Act and of the Certification Rule, including providing the required information. If the required information is present in the certification and certification conditions, the federal agency must incorporate the conditions into the federal permit. 40 C.F.R. § 121.10(a). The Certification Rule does not authorize "federal agencies to ignore state conditions they disagree with," as Plaintiffs allege. Compl. ¶ 150. EPA recognizes that courts of competent jurisdiction are better suited for a substantive review of underlying state or tribal law and whether conditions or denials are within the scope of certification. Indeed, the Certification Rule's requirement that certifying authorities provide specific information in support of a condition or a denial will help provide reviewing courts with the information necessary to conduct a proper evaluation of any disputes regarding certification conditions and denials. 85 Fed. Reg. at 42,269.

In sum, EPA reasonably interprets section 401 to grant federal agencies the authority to review certifications for procedural compliance and reject certifications or certification conditions inconsistent with the statute and implementing regulations on that basis. The Certification Rule

reflects EPA's reasonable efforts to fill a statutory gap and clarify how that process works as a practical matter.

### E.    The Certification Rule Properly Clarifies that "Discharge" Means Discharge from a Point Source into Waters of the United States.

The CWA in general is structured such that the federal government provides assistance, technical support, and grant money to assist states in managing all of the nation's waters. In contrast, the federal regulatory provisions in particular, including CWA sections 402 and 404 (33 U.S.C. §§ 1342, 1344), apply only to point source discharges into waters of the United States. Consistent with EPA's determination of the proper scope of certification above, and consistent with the CWA itself, *see* 33 U.S.C. § 1362(12), the Certification Rule defines "discharge" to mean "a discharge from a point source into a water of the United States." 85 Fed. Reg. at 42,285 (codified at 40 C.F.R. § 121.1(f)). Plaintiffs allege that the definition is "unlawful under section 401 and the Supreme Court's decisions . . . because it further narrows 'discharges' to 'point source' discharges into 'waters of the United States,' when the statute contains no such limitations." Compl. ¶ 165 (citing *S.D. Warren*, 547 U.S. at 375-76). Plaintiffs argue that in *PUD No. 1* the Supreme Court defined "discharge" for all purposes to take the word's ordinary meaning of "flowing or issuing out" and therefore, EPA is foreclosed from defining the term otherwise in the Certification Rule. Compl. ¶¶ 203-06 (citing *S.D. Warren*, 547 U.S. at 375-76 and *PUD No. 1*, 511 U.S. at 712).

But neither *PUD No. 1* nor *S.D. Warren* limits EPA's discretion in defining "discharge," and the Certification Rule's definition is not contrary to the holding in either case. Based on the text, structure, and purpose of the Clean Water Act, the 1972 amendments, relevant legislative history, and case law, as informed by policy considerations, EPA properly concluded that a certifying authority's review and action under section 401 is limited to water quality impacts to waters of the

United States resulting from a potential point source discharge or potential point source discharges from proposed federally licensed or permitted projects. *See* 85 Fed. Reg. at 42,234-35.

### 1. Into Waters of the United States

The text of section 401 expressly provides that certification is required for federal licenses or permits that authorize "any discharge *into the navigable waters*." 33 U.S.C. § 1341(a)(1) (emphasis added). Under the Act, the "term 'navigable waters' means the waters of the United States, including the territorial seas." *Id.* § 1362(7).[6] (The Agency chose to use the more commonly used term "waters of the United States" in the Certification Rule to increase clarity; however, this does not change the meaning of the definition. 85 Fed. Reg. at 42,250.) Interpreting discharge under section 401 to extend beyond such waters would conflict with and render meaningless the plain language of the statute. The authority of Congress to regulate navigable waters, including waters subject to CWA section 401 water quality certification, derives from its power to regulate the "channels of interstate commerce" under the Commerce Clause. *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824); *see also United States v. Lopez*, 514 U.S. 549, 558-59 (1995) (describing the "channels of interstate commerce" as one of three areas of congressional authority under the Commerce Clause).

The Supreme Court has explained that nothing in the legislative history of the CWA indicates that "Congress intended to exert anything more than its commerce power over navigation." *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 168 n.3 (2001) ("*SWANCC*"). The Supreme Court, however, has recognized that Congress intended "to exercise its powers under the Commerce Clause to regulate at least some waters that would not be

_____

[6] The definition of waters of the United States has been the subject of extensive litigation for many years. On January 23, 2020, EPA and the Department of the Army finalized the Navigable Waters Protection Rule that revised the definition of "waters of the United States" under the CWA. 85 Fed. Reg. at 22,250 (Apr. 21, 2020). Though this case does not address the definition of waters of the United States, challenges to that unrelated rule are also pending before this Court. *South Carolina Coastal Conservation League v. Wheeler*, Case No. 2:20-cv-01687-DCN (D.S.C.).

deemed 'navigable' under the classical understanding of that term." *United States v. Riverside Bayview Homes*, 474 U.S. 121, 133 (1985); *see also SWANCC*, 531 U.S. at 167. Thus, in drafting the Clean Water Act, including section 401, Congress asserted federal regulatory authority over more than just waters that are navigable in fact, but was cognizant that such authority derives from and is limited by "its commerce power over navigation." *SWANCC*, 531 U.S. at 168 n.3.

Further, EPA is not aware of any court decisions that directly address whether the scope of waters to which section 401 applies extends beyond waters of the United States—likely because the text is clear. In any event, the legislative history confirms EPA's interpretation: "It should be clearly noted that the certifications required by section 401 are for activities which may result in any discharge *into navigable waters*." H.R. Rep. No. 92-911 at 124, reprinted in *Legis. Hist.* (emphasis added).

### 2. Point Source Discharges

Interpreting section 401 to cover both point and nonpoint source discharges would be inconsistent with the structure of the CWA's regulatory programs, which are focused on addressing point source discharges into waters of the United States. CWA section 502(14) defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).[7] In contrast, nonpoint source pollution "arises from many dispersed activities

---

[7] In the context of CWA section 404, point sources can include bulldozers, mechanized land clearing equipment, dredging equipment, and the like. *See*, *e.g.*, *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 922 (5th Cir. 1983). Additionally, EPA has concluded that section 401 is triggered by the potential for a discharge, rather than by a "discharge of pollutants." This reading is consistent with the Supreme Court's conclusion in *S.D. Warren* that Congress intended the term "discharge" in section 401 to be broader than the term "discharge of pollutants" that is used in other provisions of the Act. *See* 547 U.S. at 380-81.

over large areas, and is not traceable to any single discrete source." *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1184 (9th Cir. 2002); *Pronsolino v. Nastri*, 291 F.3d 1123, 1126 (9th Cir. 2002) (noting that "sediment run-off from timber harvesting, for example, derives from a nonpoint source.").

The Certification Rule's limitation to point source discharges is consistent with the structure of the CWA. Although the Act "establishes a comprehensive regime to regulate 'the discharge of pollutants into the navigable waters' of the United States," *Resource Investments, Inc. v. U.S. Army Corps of Engineers*, 151 F.3d 1162, 1165 (9th Cir. 1998) (citing 33 U.S.C. § 1251(a)), its regulatory programs are focused on discharges from point sources. Section 301 contains the key regulatory mechanism: "Except as in compliance with this section and sections [302, 306, 307, 318, 402, and 404 of this Act], the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). Section 401 is the first section of Title IV of the Act, titled Permits and Licenses, and is followed by two other core CWA permitting programs that apply only to point source discharges into waters of the United States.[8]

---

[8] Section 402 provides for the National Pollutant Discharge Elimination System ("NPDES") and authorizes issuance of permits for the discharge of pollutants into navigable waters. Under section 402(a), persons are prohibited from discharging "pollutants" through a "point source" into a "water of the United States" without an NPDES permit. 33 U.S.C. § 1342(a). *See, e.g., National Wildlife Federation v. Gorsuch*, 693 F.2d 156, 164-65 (D.C. Cir. 1982) (explaining that for a particular discharge to require an NPDES permit, "five elements must be present: (1) a pollutant must be (2) added (3) to navigable waters (4) from (5) a point source"); *West Virginia Highlands Conservancy, Inc. v. Huffman*, 625 F.3d 159, 165 (4th Cir. 2010) (explaining that section 402(a) bans "any addition of any pollutant to navigable waters from any point source") (citing the definition of "discharge of a pollutant," 33 U.S.C. § 1362(12)(A)). Likewise, CWA section 404 establishes a program to regulate the discharge of dredged or fill material into waters of the United States, including wetlands. 33 U.S.C. § 1344. *See, e.g.*, *Rapanos v. United States*, 547 U.S. 715, 723 (2006). Both programs regulate point source discharges to waters of the United States. Thus, consistent with the other core federal regulatory programs established by the Act, the scope of discharges under section 401 is reasonably interpreted as applying only to point source discharges into waters of the United States.

The Certification Rule's definition is also consistent with and supported by the Ninth Circuit's decision in *Oregon Natural Desert Association v. Dombeck*, 172 F.3d 1092 (9th Cir. 1998) ("*Dombeck*"). In *Dombeck*, the Ninth Circuit considered whether a section 401 water quality certification was required for the Forest Service's issuance of a permit for grazing cattle, an activity that would "potentially cause nonpoint source pollution." 172 F.3d at 1093-94. The court concluded "from the language and structure of the Act that the certification requirement of § 1341 was meant to apply only to point source releases," and not "runoff" from grazing as plaintiffs alleged. *Id.*

In reaching its decision, the court rejected the lower court's analysis which relied solely on two definitions in CWA section 502:

> (12) The term "discharge of a pollutant" and the term "discharge of pollutants" each means (A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft.

> (16) The term "discharge" when used without qualification includes a discharge of a pollutant, and a discharge of pollutants.

*Id.* at 1095-96 (citing 33 U.S.C. §§ 1362(12), (16)). The district court incorrectly surmised that "because the unqualified term 'discharge' is defined as including, but not limited to, point source releases, it must include releases from nonpoint sources as well." *Id.* at 1096. The Ninth Circuit concluded that reference to those two definitions did not resolve the issue; instead, it determined that it must consider the language of the entire Act, "look[ing] to the provisions of the whole law, and to its object and policy." *Id.*

First, the Ninth Circuit considered the impact of the 1972 CWA amendments, which shifted the focus from achieving water quality standards set by states, i.e., the tolerable degree of pollution in a waterway (under the 1970 Act), to placing "limits on what an individual firm could discharge, regardless of whether the stream into which it was dumping was overpolluted at the time." 172 F.3d

at 1096 (quoting *Natural Resources Defense Council v. EPA*, 915 F.2d 1314, 1316 (9th Cir. 1990)).

The 1972 amendments overhauled the regulation of water quality with direct federal regulation

focused on reducing the level of effluent that flows from point sources through issuance of permits

under the National Pollutant Discharge Elimination System ("NPDES"). *Id.* (citing 33 U.S.C. §§

1311, 1342).

The court explained that nonpoint source pollution "is not regulated directly by the Act, but

rather through federal grants for state wastewater treatment plans." 172 F.3d at 1096. "Section 208

of the Act requires each such plan to contain procedures for the identification and control of

nonpoint source pollution." *Id.* (citing 33 U.S.C. § 1288(b)(2)). Indeed, "the Act provides no direct

mechanism to control nonpoint source pollution but rather uses the 'threat and promise' of federal

grants to the states to accomplish this task." *Id.* at 1097 (quoting *Shanty Town Associates Limited

Partnership v. EPA*, 843 F.2d 782, 791 (4th Cir. 1988)).

The court noted that the CWA does not contain the phrase "discharge from a nonpoint

source" or "nonpoint source discharge." *Id.* at 1098. Rather, the term "discharge" is used

consistently through the Act to mean the release of effluent from a point source. *Id.* at 1098. In

contrast, to the extent that the Act refers to "runoff," that term is used in section 208 (mentioned

above) describing urban wastewater plans, 33 U.S.C. § 1288, and section 304, providing guidelines

for identification of nonpoint sources, *id.* § 1314. The term "runoff" does not appear in section 401.

172 F.3d at 1098.

The court concluded that if Congress intended a broader meaning of the term "discharge," it

could have written section 401 to mirror section 313, the federal facilities provision, which requires

"federal agencies 'engaged in any activity which may result in the discharge *or runoff of pollutants*'

to comply with applicable water quality standards," 33 U.S.C. § 1323(a), a provision that "plainly

applies to nonpoint sources of pollution on federal land." 172 F.3d at 1098. All of the sections cross-referenced in section 401 relate to the regulation of point sources. *Id*.[9] The Ninth Circuit also found any reliance on *PUD No. 1* to be misplaced. In *PUD No. 1*, there was no dispute about whether the discharges were point source or nonpoint source—both discharges involved point sources. *Id*. at 1098. The court explained that the "Supreme Court in *PUD No. 1* did not broaden the meaning of the term 'discharge.'" *Id*. at 1098.

In a later decision, the Ninth Circuit confirmed that its reasoning in *Dombeck* is also consistent with the outcome and reasoning in *S.D. Warren*. *See Oregon Natural Desert Ass'n v. United States Forest Service*, 550 F.3d 778, 779 (9th Cir. 2008). The Supreme Court did not address whether a discharge must be from a point source in *S.D. Warren:* the issue in that case "was narrowly tailored to determine whether a discharge from a point source could occur *absent addition of any pollutant* to the water emitted from the dam turbines." *Id*. at 783-84 (emphasis added). In the Certification Rule, EPA expressly adopted the Ninth Circuit's analysis in *Dombeck* concluding that a section 401 certification is not required for nonpoint source discharges. The Agency therefore set forth a definition of discharge that clarifies that the term includes only point source discharges. 85 Fed. Reg. at 42,235. EPA's permissible interpretation of section 401 is entitled to deference. *Chevron,* 467 U.S. at 843

Moreover, as the Supreme Court acknowledged in *S.D. Warren*, because EPA had not at that time the Court decided that case "formally settled the definition" of discharge, "or even set out

---

[9] Section 401(a) requires that discharges "comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317" of Title 33. Each of those provisions applies to point source discharges: state or tribal effluent limitations (CWA § 301, 33 U.S.C. § 1311), water quality related effluent limitations (CWA § 302, 33 U.S.C. § 1312), water quality standards and implementation plans (CWA § 303, 33 U.S.C. § 1313, *see supra* note 3), national standards of performance (CWA § 306, 33 U.S.C. § 1316), and toxic and pretreatment effluent standards (CWA § 307, 33 U.S.C. § 1317).

agency reasoning," any prior "expressions of agency understanding do not command deference." 547 U.S. at 377-78. As explained above (Section IV.A.2), in *S.D. Warren*—as in *PUD No. 1*—the Supreme Court did not consider the definition of "discharge" under *Chevron* Step One or find the term to be unambiguous. Instead, the Court found no applicable definition in the Act and applied the plain meaning and common usage of the word with no reference to whether discharge was limited to such from a point source. Thus, even if this Court were to find that the Supreme Court's dictionary definition of "discharge" did involve and resolve whether "discharge" includes only point source discharges or both point and nonpoint source discharges, that prior interpretation is not controlling because the Supreme Court did not find the statute to be unambiguous. *See Brand X*, 545 U.S. at 982 (a "court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion"). Here, EPA is interpreting the ambiguous term "discharge" in section 401 and that interpretation is entitled to *Chevron* deference. Thus, under *Brand X*, defining "discharge" to mean "a discharge from a point source into a water of the United States" is not in conflict with *S.D. Warren* or *PUD No. 1*.

## V.     CONCLUSION

For the foregoing reasons, the Court should grant EPA's motion for summary judgment and dismiss the case.

Respectfully submitted this 8th day of January, 2021.

ERIC GRANT
Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division


*/s Vanessa Waldref*
VANESSA R. WALDREF (D.C. Bar No. 989692)
Vanessa.R.Waldref@usdoj.gov
ELISABETH CARTER (N.Y. Bar No. 5733274)
Elisabeth.Carter@usdoj.gov
LESLIE M. HILL (D.C. Bar No. 476008)
Leslie.Hill@usdoj.gov
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
4 Constitution Square
150 M St. NE
Suite 4.149
Washington, DC 20002
Tel: (202) 514-0375
Fax: (202) 514-8865

BETH DRAKE (#5598)
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, SC 29201
Tel: (803) 929-3061
Email: beth.drake@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I caused a true and correct copy of the foregoing Motion for

Summary Judgment to be filed with the Clerk of Court using the CM/ECF system, which will send

electronic notification of such filing to all counsel of record.

Date: January 8, 2021                                    *s/ Elisabeth Carter*